NORWAY PLAINS COMPANY *vs.* BOSTON AND MAINE RAILROAD.

Proprietors of a railroad, who transport goods over their road for hire, and deposit them in their warehouse without additional charge, until the owner or consignee has a reasonable time to take them away, are not liable, as common carriers, for the loss of the goods by fire, without negligence or default on their part, after the goods are unladen from the cars and placed in the warehouse; but are liable as warehousemen, only for want of ordinary care; although the owner or consignee has no opportunity to take the goods away before the fire.

*It seems,* that the proprietors of a railroad are not obliged to give notice to the consignee of the arrival of goods, transported by them, in order to exonerate themselves from their liability as common carriers.

ACTION OF CONTRACT upon the agreement of the defendants to transport certain goods from Rochester (N. H.) to Boston.

Norway Plains Company *v.* Boston and Maine Railroad.

The parties submitted the case to the decision of the court upon the following statement of facts: " The defendants re-ceived of the plaintiffs, at Rochester, packages and bales of mer-chandise, to be transported to Boston.   Receipts, specifying the date of the delivery of the goods to the defendants, and con-taining a description of them, were signed by the agent of the corporation, copies of which are annexed."   These receipts the form of which is printed, are respectively dated October 31st, and November 2d, 1850, and the defendants thereby acknow-ledge that they have received the goods " numbered and marked as above, which the company promises to forward by its railroad, and deliver to          or order at its depot in Boston ; freight therefor to be paid."

" The train, in which the goods mentioned in the receipt dated November 2d 1850 were sent, usually arrives in Boston at about half past twelve o'clock ; but on the day of its arrival, Novem-ber 4th 1850, did not reach the depot until a later time.   Ames, the truckman employed by the plaintiffs to take their freight from the defendants' depot in Boston, and whose principal busi-ness it is to cart goods from said depot for the plaintiffs and others, went for the goods, and waited from about two o'clock until about three and half o'clock in the afternoon, and was then told by the agents of the defendants, that they were in the hindmost car, which was then out on the wharf and inaccessi-ble to trucks or carts, and could not then be delivered ; and no time was stated when they might be expected to be delivered ; and he, being satisfied that they could not be reached until it would be too late to transport and deposit them where they were to go that day, and no notice being given when they would be delivered, departed, intending to call for them early on the next morning.   In order that the goods should be trans-ported to the place where the truckman was to carry them, it was necessary to receive them by three and a half or four o'clock, the days being short, and the stores being closed about sunset. During the ensuing night, or the morning of November 5th '850, before daylight, the depot, with the packages and bales of mer-chandise belonging to the plaintiffs, was consumed by fire.

" When a freight train arrives, it is usual to run it into the depot as far as possible, and unlade the cars which are inside, and relade them with the outward freight, and then run them off on to another track; so that those outside are detained there until those inside are unladen, reladen and passed forward; and this was the course pursued at this time, and caused corresponding delay in the delivery of the goods in the hindmost cars. And this was a reasonable course.

" Said Ames had authority from the plaintiffs to take from said depot any goods arriving there, without special directions or notice, and was in the frequent habit of so doing, and therefore was allowed by the railroad corporation, on the arrival of the train, to inspect the way bill, to inform himself what goods were on board the train; and no notice was usually given him, other than this.

" The gates of the depot were closed at half past four o'clock. The goods, described in the receipt dated November 2d, were discharged from the cars, and put on the platform in a fit state for delivery, before five o'clock, but at what precise hour is not known; and this was the usual course, when goods, from any cause, were not delivered before the gates were closed. But after Ames left, the cars were put in such a position outside of the depot, that the said goods could have been taken directly from them before half past four o'clock, had Ames remained; though that would not have been in the general course of delivery, and could only have been done by an arrangement with Ames for that purpose; and no offer or suggestion was made to him that they could be so taken. Ames frequently took goods from the cars themselves, without waiting for their being discharged on to the platform, when it was for the mutual convenience of both parties that he should do so.

" The goods, described in the receipt dated October 31st 1850, arrived on Saturday, the 2d of November, and were discharged from the cars sometime during that day, and were ready for delivery at least as early as Monday morning. No notice had been given to the plaintiffs of their arrival, otherwise than that Ames knew that they were so ready, and could have taken them, so far

as the railroad corporation was concerned, if he had seen fit. The agent of the plaintiffs, when these goods were put on the cars, knew that, according to the usual course of the trains, they would arrive in Boston on Saturday, about noon."

The arguments were had at November term 1853.

*C. G. Loring*, for the plaintiffs. The defendants, being common carriers, are liable for loss of goods, entrusted to them for transportation, by fire occasioned by any cause, excepting inevitable casualties and public enemies, until the duty of delivery has been performed. The duty of a railroad corporation to deliver is not discharged, until the arrival of the goods at the depot in the place of destination; and the unlading of the goods in a suitable position for removal by the consignee; and notice to him of their arrival and readiness for delivery; and the lapse of a reasonable time after such notice, to give the consignee opportunity to remove them. But such notice may be inferred from the usual course of business between the parties, showing information of such arrival and readiness for delivery. *Thomas* v. *Boston & Providence Railroad*, 10 Met. 472. Angell on Carriers, §§ 313 – 316. *Lewis* v. *Western Railroad*, 11 Met. 509. *Gibson* v. *Culver*, 17 Wend. 305. *Fisk* v. *Newton*, 1 Denio, 45. 2 Kent Com. (6th ed.) 604, 605, and cases cited.

*R. Choate & G. Minot*, for the defendants, to the point that any mode of delivery, sanctioned by general usage, or by any special habit of dealing with the particular bailee, would terminate the relation of common carrier, cited Story on Bailm. § 543; Angell on Carriers, § 301; *Thomas* v. *Boston & Providence Railroad*, 10 Met. 472; *Stone* v. *Waitt*, 31 Maine, 409; *Farmers' & Mechanics' Bank* v. *Champlain Transportation Co.* 18 Verm. 131, and 23 Verm. 186; *Van Santvoord* v. *St. John*, 6 Hill, 157; *Merriam* v. *Hartford & New Haven Railroad*, 20 Conn. 354.

SHAW, C. J. The liability of carriers of goods by railroads, the grounds and precise extent and limits of their responsibility, are coming to be subjects of great interest and importance to the community. It is a new mode of transportation, in some respects like the transportation by ships, lighters, and canal boats

on water, and in others like that by wagons on land; but in some respects it differs from both. Though the practice is new, the law, by which the rights and obligations of owners, consignees, and of the carriers themselves, are to be governed, is old and well established. It is one of the great merits and advantages of the common law, that, instead of a series of detailed practical rules, established by positive provisions, and adapted to the precise circumstances of particular cases, which would become obsolete and fail, when the practice and course of business, to which they apply, should cease or change, the common law consists of a few broad and comprehensive principles, founded on reason, natural justice, and enlightened public policy, modified and adapted to the circumstances of all the particular cases which fall within it. These general principles of equity and policy are rendered precise, specific, and adapted to practical use, by usage, which is the proof of their general fitness and common convenience, but still more by judicial exposition; so that, when in a course of judicial proceeding, by tribunals of the highest authority, the general rule has been modified, limited and applied, according to particular cases, such judicial exposition, when well settled and acquiesced in, becomes itself a precedent, and forms a rule of law for future cases, under like circumstances. The effect of this expansive and comprehensive character of the common law is, that whilst it has its foundations in the principles of equity, natural justice, and that general convenience which is public policy; although these general considerations would be too vague and uncertain for practical purposes, in the various and complicated cases, of daily occurrence, in the business of an active community; yet the rules of the common law, so far as cases have arisen and practices actually grown up, are rendered, in a good degree, precise and certain, for practical purposes, by usage and judicial precedent. Another consequence of this expansive character of the common law is, that when new practices spring up, new combinations of facts arise, and cases are presented for which there is no precedent in judicial decision, they must be governed by the general principe, applicable to cases most nearly analogous, but modified and adapted

to new circumstances, by considerations of fitness and pro-priety, of reason and justice, which grow out of those circum-stances. The consequence of this state of the law is, that when a new practice or new course of business arises, the rights and duties of parties are not without a law to govern them; the general considerations of reason, justice and policy, which un derlie the particular rules of the common law, will still apply, modified and adapted, by the same considerations, to the new circumstances. If these are such as give rise to controversy and litigation, they soon, like previous cases, come to be settled by judicial exposition, and the principles thus settled soon come to have the effect of precise and practical rules. Therefore, although steamboats and railroads are but of yesterday, yet the principles which govern the rights and duties of carriers of pas-sengers, and also those which regulate the rights and duties of carriers of goods, and of the owners of goods carried, have a deep and established foundation in the common law, subject only to such modifications as new circumstances may render necessary and mutually beneficial.

The present is an action brought to recover the value of two parcels of merchandise, forwarded by the plaintiffs to Boston, in the cars of the defendants. These goods were described in two receipts of the defendants, dated at Rochester, (N. H.,) the one October 31st 1850, and the other November 2d 1850.

By the facts agreed it appears, that the goods specified in the first receipt were delivered at Rochester, and received into the cars, and arrived in Boston seasonably on Saturday the 2d of November, and were then taken from the cars, and placed in the depot or warehouse of the defendants; that no special notice of their arrival was given to the plaintiffs or their agent; but that the fact was known to Ames, a truckman, who was their authorized agent, employed to receive and remove the goods, that they were ready for delivery, at least as early as Monday morning, the 4th of November, and that he might then have received them.

The goods specified in the other receipt were forwarded to Boston on Monday, the 4th of November; the cars arrived late;

Ames, the truckman, knew from inspection of the way-bill that the goods were on the train, and waited for them some time, but could not conveniently receive them that afternoon, in season to deliver them at the places to which they were directed, and for that reason did not take them; in the course of the afternoon they were taken from the cars and placed on the platform within the depot; at the usual time at that season of the year, the doors were closed. In the course of the night the depot accidentally took fire, and was burnt down, and the goods were destroyed. The fire was not caused by lightning; nor was it attributable to any default, negligence, or want of due care, or the part of the railroad corporation, or their agents or servants.

We understand the merchandise depot to be a warehouse suitably inclosed and secured against the weather, thieves, and other like ordinary dangers, with suitable persons to attend it, with doors to be closed and locked during the night, like other warehouses, used for the storage of merchandise; that it is furnished with tracks, on which the loaded cars run directly into the depot to be unloaded; that there are platforms on the sides of the track, on which the goods are first placed; that if not immediately called for and taken by the consignees, they are separated according to their marks and directions, and placed by themselves in suitable situations within the depot, there to remain a reasonable and convenient time, without additional charge, until called for by parties entitled to receive them.

The question is whether, under these circumstances, the defendants are liable.

That railroad companies are authorized by law to make roads as public highways, to lay down tracks, place cars upon them, and carry goods for hire, are circumstances which bring them within all the rules of the common law, and make them eminently common carriers. Their iron roads, though built, in the first instance, by individual capital, are yet regarded as public roads, required by common convenience and necessity, and their allowance by public authority can be only justified on that ground. The general principle has been uniformly so decided

23 *

in England and in this country; and the point is, to ascertain the precise limits of their liability. This was done to a certain extent in this court, in a recent case, with which, as far as it goes, we are entirely satisfied. *Thomas* v. *Boston & Providence Railroad,* 10 Met. 472.

Being liable as common carriers, the rule of the common law attaches to them, that they are liable for losses occurring from any accident which may befall the goods, during the transit, except those arising from the act of God or a public enemy. It is not necessary now to inquire into the weight of those considerations of reason and policy, on which the rule is founded; nor to consider what casualty may be held to result from an act of God, or a public enemy; because the present case does not turn on any such distinction. It is sufficient therefore to state and affirm the general rule. In the present case, the loss resulted from a fire, of which there is no ground to suggest that it was an act of God; and it is equally clear that it did not result from any default or negligence on the part of the company, though the goods remained in their custody. If, at the time of the loss, they were liable as common carriers, they must abide by the loss; because, as common carriers, they were bound as insurers to take the risk of fire, not caused by the act of God, and in such case, no question of default or negligence can arise. Proof that it was from a cause for which they, neither by themselves nor their servants, were in any degree chargeable, could amount to no defence, and would therefore be inadmissible in evidence. If, on the contrary, the transit was at an end, if the defendants had ceased to have possession of the goods as common carriers, and held them in another capacity, as warehousemen, then they were responsible only for the care and diligence which the law attaches to that relation; and this does not extend to a loss by an accidental fire, not caused by the default or negligence of themselves, or of servants, agents or others, for whom they are responsible.

The question then is, when and by what act the transit of the goods terminated. It was contended, in the present case, that, in the absence of express proof of contract or usage to the

contrary, the carrier of goods by land is bound to deliver them to the consignee, and that his obligation as carrier does not cease till such delivery.

This rule applies, and may very properly apply, to the case of goods transported by wagons and other vehicles, traversing the common highways and streets, and which therefore can deliver the goods at the houses of the respective consignees. But it cannot apply to railroads, whose line of movement and point of termination are locally fixed. The nature of the transportation, though on land, is much more like that by sea, in this respect, that from the very nature of the case, the merchandise can only be transported along one line, and delivered at its termination, or at some fixed place by its side, at some intermediate point. The rule in regard to ships is very exactly stated in the opinion of Buller, J. in *Hyde* v. *Trent & Mersey Navigation*, 5 T. R. 397. "A ship trading from one port to another has not the means of carrying the goods on land; and, according to the established course of trade, a delivery on the usual wharf is such a delivery as will discharge the carrier."

Another peculiarity of transportation by railroad is, that the car cannot leave the track or line of rails, on which it moves; a freight train moves with rapidity, and makes very frequent journeys, and a loaded car, whilst it stands on the track, necessarily prevents other trains from passing or coming to the same place; of course, it is essential to the accommodation and convenience of all persons interested, that a loaded car, on its arrival at its destination, should be unloaded, and that all the goods carried on it, to whomsoever they may belong, or whatever may be their destination, should be discharged as soon and as rapidly as it can be done with safety. The car may then pass on to give place to others, to be discharged in like manner. From this necessary condition of the business, and from the practice of these transportation companies to have platforms on which to place goods from the cars, in the first instance, and warehouse accommodation by which they may be securely stored, the goods of each consignment by themselves, in accessible places, ready to be delivered, the court are of opinion, that the duty

assumed by the railroad corporation is — and this, being known to owners of goods forwarded, must, in the absence of proof to the contrary, be presumed to be assented to by them, so as to constitute the implied contract between them — that they will carry the goods safely to the place of destination, and there discharge them on the platform, and then and there deliver them to the consignee or party entitled to receive them, if he is there ready to take them forthwith; or, if the consignee is not there ready to take them, then to place them securely and keep them safely a reasonable time, ready to be delivered when called for. This, it appears to us, is the spirit and legal effect of the public duty of the carriers, and of the contract between the parties, when not altered or modified by special agreement, the effect and operation of which need not here be considered.

This we consider to be one entire contract for hire; and although there is no separate charge for storage, yet the freight to be paid, fixed by the company, as a compensation for the whole service, is paid as well for the temporary storage, as for the carriage. This renders both the services, as well the absolute undertaking for the carriage, as the contingent undertaking for the storage, to be services undertaken to be done for hire and reward. From this view of the duty and implied contract of the carriers by railroad, we think there result two distinct liabilities: first, that of common carriers, and afterwards that of keepers for hire, or warehouse keepers; the obligations of each of which are regulated by law.

We may then say, in the case of goods transported by railroad, either that it is not the duty of the company as common carriers, to deliver the goods to the consignee, which is more strictly conformable to the truth of the facts; or, in analogy to the old rule, that delivery is necessary, it may be said that delivery by themselves as common carriers, to themselves as keepers for hire, conformably to the agreement of both parties, is a delivery which discharges their responsibility as common carriers. If they are chargeable after the goods have been landed and stored, the liability is one of a very different character, one which binds them only to stand to losses occasioned by their fault or negli-

gence. Indeed, the same doctrine is distinctly laid down in *Thomas* v. *Boston & Providence Railroad*, 10 Met. 472, with the same limitation. The point that the same company, under one and the same contract, may be subject to distinct duties, for a failure in which they may be liable to different degrees of responsibility, will result from a comparison of the two cases of *Garside* v. *Trent & Mersey Navigation*, 4 T. R. 581, and *Hyde* v. *Trent & Mersey Navigation*, 5 T. R. 389. See also *Van Sant- voord* v. *St. John*, 6 Hill, 157, and *McHenry* v. *Philadelphia, Wil- mington & Baltimore Railroad*, 4 Harring. 448.

The company, having received an adequate compensation for the entire service, if they store the goods, are paid for that ser- vice ; they are depositaries for hire, and of course responsible for the security and fitness of the place, and all precautions neces- sary to the safety of the goods, and for ordinary care and atten- tion of their servants and agents, in keeping and delivering them when called for This enforces the liability of common carriers, to the extent to which it has been uniformly carried by the com- mon law, so far as the reason and principle of the rule render it fit and applicable, that is, during the transit ; and affords a rea- sonable security to the owner of goods for their safety, until actually taken into his own custody.

The principle, thus adopted, is not new ; many cases might be cited ; one or two will be sufficient. Where a consignee of goods, sent by a common carrier to London, had no warehouse of his own, but was accustomed to leave the goods in the wagon office, or warehouse of the common carrier, it was held, that the transit was at an end, when the goods were received and placed in the warehouse. *Rowe* v. *Pickford*, 8 Taunt. 83. Though this was a case of stoppage *in transitu*, it decides the principle. But another case in the same volume is more in point. *In re Webb*, 8 Taunt. 443. Common carriers agreed to carry wool from London to Frome, under a stipulation, that when the con- signees had not room in their own store to receive it, the carriers, without additional charge, would retain it in their own ware- house, until the consignor was ready to receive it. Wool thus carried, and placed in the carriers' warehouse, was destroyed by

an accidental fire; it was held, that the carriers were not liable. The court say, that this was a loss which would fall on them, as carriers, if they were acting in that character, but would not fall on them as warehousemen.

This view of the law, applicable to railroad companies, as common carriers of merchandise, affords a plain, precise and practical rule of duty, of easy application, well adapted to the security of all persons interested; it determines that they are responsible as common carriers until the goods are removed from the cars and placed on the platform; that if, on account of their arrival in the night, or at any other time, when, by the usage and course of business, the doors of the merchandise depot or warehouse are closed, or for any other cause, they cannot then be delivered; or if, for any reason, the consignee is not there ready to receive them; it is the duty of the company to store them and preserve them safely, under the charge of competent and careful servants, ready to be delivered, and actually deliver them when duly called for by parties authorized and entitled to receive them; and for the performance of these duties after the goods are delivered from the cars, the company are liable, as warehousemen, or keepers of goods for hire.

It was argued in the present case, that the railroad company are responsible as common carriers of goods, until they have given notice to consignees, of the arrival of goods. The court are strongly inclined to the opinion, that in regard to the transportation of goods by railroad, as the business is generally conducted in this country, this rule does not apply. The immediate and safe storage of the goods on arrival, in warehouses provided by the railroad company, and without additional expense, seems to be a substitute better adapted to the convenience of both parties. The arrivals of goods, at the larger places to which goods are thus sent, are so numerous, frequent, and various in kind, that it would be nearly impossible to send special notice to each consignee, of each parcel of goods, or single article, forwarded by the trains. We doubt whether this is conformable to usage; but perhaps we have not facts enough disclosed in this case, to warrant an opinion on that question. As far as the facts

on this point do appear, it would seem probable, that persons, frequently forwarding goods, have a general agent, who is permitted to inspect the way-bills, ascertain what goods are received for his employers, and take them as soon as convenient after their arrival. It also seems to be the practice, for persons forwarding goods, to give notice by letter, and inclose the railroad receipt, in the nature of a bill of lading, to a consignee or agent, to warn him to be ready to receive them. From the two specimens of the form of receipt given by these companies, produced in the present case, we should doubt whether the name of any consignee or agent is usually specified in the receipt and on the way-bill. The course seems to be, to specify the marks and numbers, so that the goods may be identified by inspection and comparison with the way-bill. If it is not usual to specify the name of a consignee in the way-bill, as well as on the receipt, it would be impossible for the corporation to give notice of the arrival of each article and parcel of goods. In the two receipts produced in this case, which are printed forms, a blank is left for the name of a consignee, but it is not filled, and no consignee in either case is named. The legal effect of such a receipt and promise to deliver no doubt is, to deliver to the consignor or his order. If this is the usual or frequent course, it is manifest that it would be impossible to give notice to any consignee; the consignor is *prima facie* the party to receive, and he has all the notice he can have. But we have thought it unnecessary to give a more decisive opinion on this point, for the reason, already apparent, that in these receipts no consignee was named; and for another, equally conclusive, that Ames, the plaintiffs' authorized agent, had actual notice of the arrival of both parcels of goods.

In applying these rules to the present case, it is manifest that the defendants are not liable for the loss of the goods. Those which were forwarded on Saturday arrived in the course of that day, lay there on Sunday and Monday, and were destroyed in the night between Monday and Tuesday. But the length of time makes no difference. The goods forwarded on Monday were unladen from the cars, and placed in the depot, before the

fire.   Several circumstances are stated in the case, as to the agent's calling for them, waiting, and at last leaving the depot before they were ready.   But we consider them all immaterial. The argument strongly urged was, that the responsibility of common carriers remained until the agent of the consignee had an opportunity to take them and remove them.   But we think the rule is otherwise.   It is stated, as a circumstance, that the train arrived that day at a later hour than usual.   This we think immaterial; the corporation do not stipulate that the goods shall arrive at any particular time.   Further, from the very necessity of the case, and the exigencies of the railroad, the corporation must often avail themselves of the night, when the road is less occupied for passenger cars; so that goods may arrive and be unladen, at an unsuitable hour in the night, to have the depot open for the delivery of the goods.   We think, therefore, that it would be alike contrary to the contract of the parties, and the nature of the carriers' duty, to hold that they shall be responsible as common carriers, until the owner has practically an opportunity to come with his wagon and take the goods; and it would greatly mar the simplicity and efficacy of the rule, that delivery from the cars into the depot terminates the transit.   If therefore, for any cause, the consignee is not at the place to receive his goods from the car as unladen, and in consequence of this they are placed in the depot, the transit ceases.   In point of fact, the agent might have received the second parcel of goods in the course of the afternoon on Monday, but not early enough to be carried to the warehouses, at which he was to deliver them; that is, not early enough to suit his convenience.   But, for the reasons stated, we have thought this circumstance immaterial, and do not place our decision for the defendants, in regard to this second parcel, on that ground.                    *Judgment for the defendants.*