REVISED, January 11, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-50958

_____

LONE STAR LADIES INVESTMENT CLUB, A Texas General Partnership, on behalf of itself and all others similarly situated; MARK BALIUS; JOSEPH CASANO; WILFORD A. GRIMES; FRANK A. QUIRICONI; RALPH CASEY,

                                        Plaintiffs-Appellants,

versus

SCHLOTZSKY'S INC.,

                                        Defendants,

SCHLOTZSKY'S INC.; MONICA GILL; JOHN M. ROSILLO; JEFFREY J. WOOLEY; JOHN C. WOOLEY,

                                        Defendants-Appellees

_____

RONALD TRAUB, on behalf of himself and all others similarly situated,

                                        Plaintiff-Appellant

versus

SCHLOTZSKY'S, INC.; JOHN C. WOOLEY; JEFFREY J. WOOLEY; JOHN M. ROSILLO; MONICA GILL,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
For the Western District of Texas
_____

January 9, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This appeal is from dismissal of a suit on behalf of a class of purchasers of securities, charging that Schlotzsky's and four of its officers and directors violated the Securities Act of 1933[1] and the Securities and Exchange Act of 1934[2] in their required financial filing, including a public offering of securities. The district court, faulting the absence of pleading particulars, dismissed the complaint and refused leave to file an amended complaint deleting all claims under the Securities and Exchange Act. We are persuaded that the proffered amended complaint should have been allowed. We reverse and remand to the district court with instructions to grant leave to file the amended complaint and for further proceedings.

I

According to plaintiffs:

(a) Defendant Schlotzsky's is a franchisor of quick service restaurants that feature made-to-order sandwiches with distinctive bread, baked daily at each location. Schlotzsky's was a privately held corporation until December 1995 when, pursuant to a Registration Statement and Prospectus filed with the SEC, it issued and sold 2,250,000 shares of common stock at a price of $11 per share to the investing public in an initial public offering (the "IPO").

(b) On September 4, 1997, Schlotzsky's announced that it had filed a Registration Statement and Prospectus with the SEC for a secondary offering of common stock. On September 24, 1997, the Registration Statement and

---

[1] 15 U.S.C. 77k and 77l.

[2] 15 U.S.C. 78j.

Prospectus for the sale of 2,300,000 shares of Schlotzsky's common stock at a price of $18.375 became effective (the "Offering"). The Registration Statement and Prospectus provided for an over-allotment option pursuant to which the Company could sell an additional 231,825 shares and the selling shareholders could sell an additional 113,175 shares. Pursuant to the Registration Statement and Prospectus, the Company issued and sold 1,731,825 shares of common stock in the offering and certain selling shareholders sold 913,175 shares.

Schlotzsky's developed a "Turnkey Program," by which Schlotzsky's would completely prepare a franchise operation and a purchaser need only turn the key to begin doing business. The Turnkey Program was a success and accounted in 1997 for much of Schlotzsky's profit. In 1997, Schlotzsky's issued a press release reporting Turnkey revenues of $762,000 – an 849% increase over the preceding year. By March 31 of 1998 it had grown to 703 stores from 463 stores in December 1995.

Schlotzsky's fueled its sales of franchises by offering financial assistance. This often included Schlotzsky's guaranteeing the loans made for a purchase of a franchise. This suit attacks Schlotzsky's reporting of profits from its Turnkey Program. Schlotzsky's would recognize the full revenue received on a Turnkey Program sale, without any deduction for Schlotzsky's guarantee of the franchisee's loan. Yet Generally Accepted Accounting Practices require the reduction of income from sales to account for a seller's continuing obligations with respect to

3

the property.[3]  Schlotzsky's made no such adjustments, with resulting higher revenues and higher profit margins for the Turnkey Program.

The prospectus for Schlotzsky's SPO and other financial filings contained these nonconforming profit calculations.  They also, however, made disclosures regarding the Turnkey Program, including the use of guarantees of debt.

On April 6, 1998, on the advice of its auditors, Schlotzsky's issued a press release disclosing that Turnkey revenues had been overstated by approximately $3.4 million dollars.  The market reacted by a 27% decline in the trading price of Schlotzsky's stock.  According to the plaintiffs:

> "An April 15, 1998 press release admitted that 1997 Turnkey revenue had been $1,139,000, rather than the $4,538,000 that Schlotzsky's had earlier reported. Schlotzsky's had overstated 1997 Turnkey revenues by $3,399,000 or 298%.  The company confirmed that actual earnings per share for fiscal 1997 had been only $0.71 rather than $0.82.  Based on improper accounting for Turnkey revenues, Schlotzsky's had overstated Fiscal 1997 earnings per share by 15%.

The complaint asserted violations under both the 1934 Exchange Act and the 1933 Securities Act on behalf of all purchasers of Schlotzsky's stock from April 29, 1997, through April 5, 1998.  Granting a 12(b)(6) motion, the district court held that the plaintiffs had not pleaded facts sufficient to give rise to a strong inference of scienter as required by the Private

---

[3] Statement of Financial Accounting Standard No. 66, Accounting for Sales of Real Estate.

Securities Litigation Reform Act.

The district court, invoking *Melder v. Morris*,[4] applied Rule 9(b)'s heightened pleading requirements to the claims asserted under the 1933 Act. It insisted that despite the strict liability provision of the act plaintiffs had not adequately pleaded scienter, required because plaintiffs had grounded all of their claims in fraud such that they were "merely wholesale adoptions of plaintiffs' section 10(b) securities fraud claims."

The district court also held that the defendants were not "sellers" to the members of the class under section 12 of the Securities Act because the SPO was a firm underwriting. Under that method of selling, all stocks are sold to underwriters under a firm commitment and the underwriters sell to the public, here class members.

Plaintiffs then sought leave to file an amended complaint that dropped all claims under the 1934 Exchange Act, relying only on asserted violations of the 1933 Securities Act. The district court denied leave to file the amended complaint and refused to reconsider that decision.

This appeal followed.

## II

### A

Our inquiry is framed by the question of whether the

---

[4] 27 F.3d 1097, 1100 n.6 (5th Cir. 1994).

district court abused its discretion by denying plaintiffs' requests for leave to amend, twice made.[5]  The proposed amended complaint made no 1934 Act claims.[6]

We are persuaded that the district court erred in denying plaintiffs leave to file their amended complaint, and do not reach the question of whether the original 1934 Act claims were pleaded with the specificity required by the Reform Act.  The district court's discretion is here limited by Rule 15(a)'s provision that leave "shall be freely given."[7]  This standard favors leave as a necessary companion to notice pleading and discovery.  Not surprisingly, denying leave to amend, absent articulable reason, is "not an exercise of discretion" but rather "abuse of . . . discretion."[8]  This is not an insistence that a district court engage in a formal recitation of reasons when the

---

[5] They did so first in the conclusion to their memorandum opposing the motion to dismiss and again after the motion to dismiss had been granted.  Plaintiffs moved for reconsideration of the dismissal, requesting leave to amend, and attaching a proposed amended complaint.

[6] Only two of the plaintiffs, Lead Plaintiffs Ronald Traub and Ralph Casey, moved to amend their complaint.  The Motion, however, asserts that the remaining named plaintiffs "are not seeking to reassert their Exchange Act claims."  Further, the proposed Amended Complaint is styled as a class action, on behalf of all persons who purchased Schlotzsky's stock during the relevant period.  That class would, presumably, include any named plaintiffs who did not expressly sign on to the Motion to Amend.

[7] *Forman v. Davis*, 371 U.S. 178, 182 (1962).

[8] *Id.*

6

reasons for denying leave are facially obvious.[9]  The reason for denial must be clear, however, either from the findings of the district court or elsewhere in the record.[10]

The district court stated no reason, and we perceive no obviously correct reason for denying leave to amend.  This is not a case where plaintiffs have already had multiple opportunities to amend their pleadings.[11]  Nor is this a case in which leave to amend would prejudice the defense.  Rather, the proposed amendment eliminated the pleading issues attending the claims under the 1934 Act asserted in the complaint.  And prejudice is the "touchstone of the inquiry under rule 15(a)."[12]

B

Defendants urge that for two reasons an amendment would have been futile.  First, the revised complaint, it is said, still relied so heavily on allegations of fraud as to invoke and fail

---

[9] *See, e.g., Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.*, 195 F.3d 765, 771 (5th Cir. 1999).

[10] *See, e.g., Rolf v. City of San Antonio*, 77 F.3d 823, 828-29 (5th Cir. 1996) ("The district court's order does not state its reasons for denying leave.  Our review of the record reveals no substantial reason to deny leave to amend.  Appellants should have been granted leave to file an amended complaint."); *Halbert v. City of Sherman*, 33 F.3d 526, 529-30 (5th Cir. 1994) (holding that denial of leave to amend is error in the absence of justifying reasons).

[11] *Compare Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607-08 (5th Cir. 1998).

[12] *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 246 (5th Cir. 1997).

7

Rule 9(b).  Second, other disclosures cured the allegedly misleading filings.  We address each contention in turn, and find neither persuasive.

1

Citing *Melder v. Morris*,[13] the district court applied Rule 9(b) to plaintiff's claims under the 1933 Securities Act and dismissed them for failure to satisfy Rule 9(b).  *Melder* applied Rule 9(b) to claimed violations of the 1933 Securities Act claim, asserting that "[w]hen 1933 Securities Act claims are grounded in fraud rather than in negligence as they clearly are here, Rule 9(b) applies."[14]

Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not.[15]  It does not follow, however, that Rule 9(b) or *Melder* justifies dismissing a 1933 Act claim when, disregarding the deficient allegation of fraud, a claim is stated.  Rather, Rule 9(b) insists that "all averments of fraud . . . shall be stated with particularity."  The price of impermissible generality is that

---

[13] 27 F.3d 1097, 1100 n.6 (5th Cir. 1994).

[14] *Id.*

[15] *See* Fed. R. Civ. Pro. 9(b) ("In *all* averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") (emphasis added).

the averments will be disregarded.[16]

Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated.  The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.  There is a qualification.  A district court need not rewrite such a deficient complaint.  It may dismiss, without prejudice, placing that responsibility upon counsel.

*Melder* quite properly observes that "[w]hen 1933 Securities Act claims are grounded in fraud rather than negligence . . . Rule 9(b) applies."[17]  In *Melder*, the application of Rule 9(b) was fatal because of "the complaint's *wholesale* adoption of the allegations under the securities fraud claims for purposes of the Securities Act claims."[18]  In other words, as we have explained, a district court is not required to sift through allegations of fraud in search of some "lesser included" claim of strict liability.  It may dismiss.  If it does so, it should ordinarily accept a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and

---

[16] We assume, without deciding, that the averments of fraud were insufficient.

[17] 27 F.3d at 1100 n.6.

[18] *Id.* (emphasis added).  In *Melder*, plaintiffs were allowed to replead twice and the district court held a hearing.

9

still states a claim.

The proposed amended complaint left no room for misunderstanding. It expressly "do[es] not assert that defendants are liable for fraudulent or intentional conduct and disavow[s] and disclaim[s] any allegation of fraud." It avers that Schlotzsky's made untrue statements of material facts and omitted to state material facts, in violation of 15 U.S.C. § 77k. Those claims do not "sound in fraud" and cannot be dismissed for failure to satisfy Rule 9(b).

2

We do not read the district court's ruling to be that no claim under the 1933 Act was stated, given the disclosures in the offering materials and other filings regarding defendants' treatment of income. Such a declaration in ruling on a Rule 12(b)(6) motion would have been error. Rather, it properly noted that defendants disclosed certain facts concerning the Turnkey Program, including its revenue recognition practices. The district court then concluded that such disclosures strengthened the contention that defendants were neither recklessly nor intentionally fraudulent and hence the complaint had failed to sufficiently allege scienter under the 1934 Act violations.

Whatever the ultimate answer to the adequacy of the disclosures under the 1933 Act, we are not persuaded that that decision ought be made here in ruling on a motion to dismiss for

10

failure to state a claim.[19] Viewing the interaction between Schlotzsky's revenue recognition and the disclosure of its Turnkey Practices in the light most favorable to the plaintiff, as we must, the amended complaint was not vulnerable to a Rule 12(b)(6) motion on this basis. The lower threshold of liability under section 11 and 12 of the 1933 Act as compared to the 1934 Act here matters a great deal. This threshold and its relevance to a Rule 12(b)(6) motion is illustrated by two hornbook principles of securities law. The liability of an issuer to a plaintiff who purchases a security issued pursuant to a registration statement for a material misstatement or omission is "virtually absolute."[20] "Defendants other than the issuer can avoid liability by demonstrating due diligence."[21] And this is an affirmative defense that must be pleaded and proved.[22]

In sum, we are persuaded that the amendment would not have been futile and the district court ought to have granted leave to file the amended complaint. One matter remains. The district court rejected the section 12(a)(2) claims on the additional

---

[19] An example of the disclosure made appears in the 1997 First Quarter 10-Q: "The Company guarantees <u>certain</u> leases of its franchisees for <u>limited periods of time</u>, which may affect its ability to obtain financing in the future." (emphasis added)

[20] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

[21] *Id.*

[22] *See* Fed. R. Civ. P. 8(c).

11

ground that defendants were not the sellers of the securities to plaintiffs.

III

Defendants urge, and the district court accepted, that they cannot be held liable as "sellers" under section 12 of the 1933 Act because the stock offering was by a firm commitment underwriting, in which defendants sold stock to underwriters, who then sold to the public.[23]

Defendants rely upon *Shaw v. Digital Equipment Corp.*,[24] which held that since "the issuer in a firm commitment underwriting does not pass title to the securities, [the issuer and its officers] cannot be held liable as 'sellers' under Section 12(2) unless they actively 'solicited' the plaintiffs' purchase of securities to further their own financial motives."[25]

As we see it, the pivot point here is not whether defendants were "sellers", because "Congress expressly intended to define broadly" the concept of seller to "encompass the entire selling

---

[23] Section 11 imposes liability on "every person who signed the registration statement" and "every person who was a director of . . . the issuer at the time of the filing." 15 U.S.C. § 77k.

[24] 82 F.3d 1194 (1st Cir. 1996).

[25] 82 F.3d at 1215.

12

process, including the seller/agent transaction."[26]  Rather, our issue is controlled by section 12's provision that a seller is only liable "to the person purchasing such security from him."[27] The argument is that in a firm commitment underwriting, the public purchases from the underwriter, not from the issuer.

*Pinter* held that the purchase clause of section 12 does not "exclude solicitation from the category of activities that may render a person liable when a sale has taken place."[28]  For example, "a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title,"[29] for example a broker acting for an issuer.  *Shaw* found that under some circumstances, "an issuer involved in a firmly underwritten public offering could be a 'seller' for purposes of Section 12(2)" where the issuer solicited the sale of the stock.[30]  This much is clear under *Pinter*.

It is also true under *Pinter* that under some circumstances, the issuer is immune from section 12 liability in a firm

---

[26] *Pinter v. Dahl*, 486 U.S. 622, 643 (1988).

[27] 15 U.S.C. §77l(a).

[28] 486 U.S. at 644.

[29] *Id.*

[30] 82 F.3d at 1216.

commitment underwriting. In footnote 21, the *Pinter* Court explained that:

> One important consequence of [the purchaser clause] is that §12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against *his seller's seller*.[31]

In sum, in a firm commitment underwriting, such as this one, the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers. Rather, the public purchases from the underwriters, and suing the issuers is an attempt to "recover against [the] seller's seller."[32] It is true that there are unusual cases in which the issuer is sufficiently active in promoting the securities as to essentially become the vendor's agent. But that possibility does not weaken this basic principle. Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. That said, *Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent.

On remand, plaintiffs will bear the burden of demonstrating that these issuers did solicit in a manner sufficient to satisfy *Pinter*, if they wish to preserve their section 12 claims. We say

---

[31] 486 U.S. at 644 n.21 (emphasis added).

[32] *Id.*

14

only that this claim cannot be decided in this case and on these facts upon a Rule 12(b)(6) motion, although the parties may bring the question again upon a properly developed record under Rule 56 of the Federal Rules of Civil Procedure.[33]  We decline to step further onto this terrain by applying these principles to possible facts that plaintiffs might adduce.  The able district court is better equipped to first address these issues, with facts in hand.

We REVERSE the decision of the district court to deny leave to file the amended complaint, REMAND the case with instructions to grant leave and for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

---

[33] The question of controlling person liability under Section 15 of the 1933 Securities Act is derivative of liability under Sections 11 and 12(2) and must abide that ultimate resolution.

15