EMINENCE CAPITAL, LLC,
Plaintiff–Appellant,

and

Jay Spechler, Plaintiff,

v.

ASPEON, INC.; Richard P. Stack,
Defendants–Appellees.

No. 01–56728.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 2002.

Filed Jan. 21, 2003.

Solomon B. Cera, Gold Bennett Cera &
Sidener LLP, San Francisco, CA, for the
plaintiff-appellant.

Donald A. Daucher, Paul, Hastings, Ja-
nofsky & Walker LLP, Costa Mesa, CA,
for the defendants-appellees.

Before REINHARDT, TROTT and
SILVERMAN, Circuit Judges.

PER CURIAM Opinion; Concurrence
by Judge REINHARDT.

## OPINION

PER CURIAM.

Eminence Capital, LLC, lead plaintiff in
this class action securities fraud litigation,
appeals the district court's dismissal with
prejudice under Fed.R.Civ.P. 12(b)(6) of
its first amended consolidated complaint
for failure to state a claim. Because the
district court failed to provide sufficient
reasons to overcome the presumption in
favor of granting leave to amend, we re-
verse the judgment.

## I. BACKGROUND

We summarize the facts set forth in
appellant's first amended consolidated
complaint and assume them to be true for
the purposes of our decision. *See Epstein
v. Washington Energy Co.,* 83 F.3d 1136,
1140 (9th Cir.1996).

### A. Facts

Appellee Aspeon, Inc., a company based
in Irvine, California, manufactures and
sells touch-screen hardware systems for
retail business computer networks, such as
those used by waiters in restaurants to
enter customer orders.[1] Appellee Richard
Stack is Aspeon's Chief Executive Officer,
and appellee Horace Hertz is Aspeon's
former Chief Financial Officer. Lead
plaintiff Eminence Capital, LLC, is an in-
stitutional investor and one of the share-

1. Aspeon was formerly known as Javelin Sys-   tems, Inc.

holders who purchased stock in Aspeon between October 28, 1999 and September 28, 2000 ("class period"). During the class period, Aspeon was a publicly traded company required to file with the Securities and Exchange Commission quarterly reports, known as Form 10–Qs, at the end of each financial quarter. At issue in this case are the 10–Qs for the quarters ending September 30, 1999, December 31, 1999, and March 31, 2000.

In each of its initial reports, accompanied by press releases, Aspeon painted a rosy picture of the company's profitability and financial prospects. In its 10–Q for the quarter ending September 30, 1999, Aspeon reported that revenues totaling $20.2 million represented an increase of 57 percent from the previous year. In its 10–Q for the quarter ending December 31, 1999, Aspeon reported that revenues totaling $24.3 million represented an increase of 36 percent from the previous year. In the accompanying press release, Stack stated that these "results demonstrate the ability of our management team to operate profitably the original hardware business while incubating a sizable ASP business." In its 10–Q for the quarter ending March 31, 2000, Aspeon reported revenues of $20.0 million compared to $21.1 million from the previous year. In a press release

Stack announced that the company had "a clear path to profitability."

On September 29, 2000, Aspeon announced that it would be restating the quarterly results for the period in question. On or about December 18, 2000, Aspeon filed its restatement. In its restated form 10–Q/A for the quarter ending September 30, 1999, Aspeon stated that there had actually been losses resulting in income loss of 21% from the previously reported results.[2] In its restated form 10–Q/A for the quarter ending December 31, 1999, Aspeon also reported losses rather than gains.[3]

Finally, in its restated form 10–Q/A for the quarter ending March 31, 2000, Aspeon reported losses resulting in a reduction of net income available to shareholders of $1,717,000. The price of Aspeon stock declined on October 10, 2000 to $1.50 per share, from a high of $30 per share on March 10, 2000. Aspeon was de-listed from the NASDAQ on January 4, 2001.

### B. Procedural History

On October 11, 2000, Jay Spechler filed a class action suit against Aspeon, Stack, and Hertz in federal district court. The complaint alleged violations of sections 10(b)[4] and 20(a)[5] of the Securities Ex-

---

**2.** The restatement announced a decrease in reported revenue of $269,000, a reduction in gross profit of $78,700, and net income of $.05 per share for the quarter, compared with previously reported net income of $.07 per share for the quarter.

**3.** The restatement demonstrated a decrease in reported "other income" of $259,800, a reduction in reported net income of $186,000, a reduction in income from operations of $440,000, and a reduction in net income of $269,000.

**4.** The act in part makes it unlawful:
To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**5.** The section, targeting "controlling persons," states that:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly in-

change Act of 1934, and of Rule 10b–5.[6]

Eventually, eight separate shareholder suits were filed against Aspeon. On December 22, 2000, the district court granted plaintiff Spechler's motion to consolidate the cases. On January 5, 2001, the district court designated Eminence as lead plaintiff under 15 U.S.C. § 78u–4(a)(3)(B). On January 31, 2001, Eminence filed a "consolidated complaint." The district court granted Aspeon's motion to dismiss the complaint without prejudice on April 20, 2001. On May 21, 2001, Eminence filed a "first amended consolidated complaint." In addition to citing Aspeon's restatements for the first three quarters of fiscal year 2000, the first amended consolidated complaint also recounted a number of factual allegations to support its securities fraud claims. For purposes of clarity, the district court divided these claims into three categories: accounting improprieties, poor business judgments by Aspeon, and the allegedly suspicious relationship between Aspeon and its accountants, PriceWaterhouseCoopers.

On September 14, 2001, the district court granted Aspeon's motion to dismiss the first amended consolidated complaint for failure to state a claim, with prejudice. While acknowledging that the complaint in some respects came close to satisfying the heightened pleading standards for securities fraud cases, the district court nevertheless found that Eminence had failed to plead "false statements" with particularity

under § 10(b), and that it had failed to satisfy the scienter requirement of its § 10(b) claim, pursuant to the standards set forth in the Private Securities Litigation Reform Act of 1995 and in *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir.1999). Finally, stating that Eminence had had "three bites at the apple," the district court dismissed the complaint with prejudice. Eminence appeals.

## II. DISCUSSION

Eminence contends that the district court abused its discretion in dismissing the first amended consolidated complaint with prejudice and thereby denying leave to amend. We agree, and reverse the judgment of the district court.

After a party has amended a pleading once as a matter of course, it may only amend further after obtaining leave of the court, or by consent of the adverse party. Fed.R.Civ.P. 15(a). Generally, Rule 15 advises the court that "leave shall be freely given when justice so requires." This policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir.2001)(quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990)). In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court offered the following factors a district court should consider in deciding whether to grant leave to amend:

duce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

**6.** The rule provides that:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or court of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182, 83 S.Ct. 227. *See also Allen v. City of Beverly Hills,* 911 F.2d 367, 373 (9th Cir.1990)(citing *Foman* factors, as well as "previous amendment"); *Hurn v. Ret. Fund Trust of the Plumbing, Heating & Piping Indus. of S. Cal.,* 648 F.2d 1252, 1254 (9th Cir.1981).

Not all of the factors merit equal weight. As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight. *See DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 185 (9th Cir.1987). Prejudice is the "touchstone of the inquiry under rule 15(a)." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 368 (5th Cir.2001); *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir.1973)(stating that "the crucial factor is the resulting prejudice to the opposing party"); *cf. DCD Programs,* 833 F.2d at 186–87 (noting that party opposing amendment "bears the burden of showing prejudice"). Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend. *See Lowrey v. Tex. A & M Univ. Sys.,* 117 F.3d 242, 245 (5th Cir.1997). A simple denial of leave to amend without any explanation by the district court is subject to reversal. Such a judgment is "not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1292–93 (9th Cir.1983)(noting

"where the record does not clearly dictate the district court's denial, we have been unwilling to affirm absent written findings"); *Rolf v. City of San Antonio,* 77 F.3d 823, 828–29 (5th Cir.1996); *United Steelworkers of Am., AFL–CIO v. Mesker Bros. Indus., Inc.,* 457 F.2d 91, 94 (8th Cir.1972).

Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment. *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996). A district court's failure to consider the relevant factors and articulate why dismissal should be with prejudice instead of without prejudice may constitute an abuse of discretion. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227; *see also Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986); *Klamath–Lake,* 701 F.2d at 1292–93.

Adherence to these principles is especially important in the context of the PSLRA. The PSLRA requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail "giving rise to a strong inference of deliberate recklessness." *In re Silicon Graphics,* 183 F.3d 970, 979 (9th Cir.1999). This is not an easy standard to comply with—it was not intended to be— and plaintiffs must be held to it. But how much detail is *enough* detail? When is an inference of deliberate recklessness *sufficiently* strong? There is no bright-line rule. Sometimes it is easy to tell, but often it is not. The acid test is a motion to dismiss. We need to bear in mind that we are not operating in the world of notice pleadings. In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.

■ Here, the district court concluded that leave to amend should be denied because "[p]laintiffs have had three 'bites at the apple' and defend the dismissal without prejudice only on grounds that the special committee will release a report that will provide all the requisite details [required to plead a case under PSLRA]."

To begin with, plaintiffs had not filed three substantially similar complaints alleging substantially similar theories. This is not a case where plaintiffs took "three bites at the apple" by alleging and re-alleging the same theories in an attempt to cure pre-existing deficiencies. Instead, plaintiffs' First Amended Consolidated Complaint included additional theories not previously alleged. Consequently, it is not accurate to imply that plaintiffs had filed multiple pleadings in an attempt to cure pre-existing deficiencies.

In addition, nothing suggests that plaintiffs' proffer that additional evidence was forthcoming which would enable them to add necessary details to their complaint was false or made in bad faith or for an improper purpose. Indeed, the opposite seems to be the case. The existing record demonstrates that plaintiffs' allegations were not frivolous and that they were endeavoring in good faith to meet the heightened pleading requirements governing the PSLRA. The district court acknowledged that "plaintiffs allege with the requisite detail regarding who, what, when, and by whom false statements were made." The district court only concluded that plaintiffs "fail[ed] to plead sufficiently how and why the financial statements were false because plaintiffs fail to provide requisite detail in the accounting allegations."

We do not quarrel with the district judge's assessment that the First Amended Consolidated Complaint was deficient. However, we believe that the district court did not appropriately exercise its discretion by denying plaintiffs leave to amend where, as here, plaintiffs' allegations were not frivolous, plaintiffs were endeavoring in good faith to meet the heightened pleading requirements and to comply with court guidance, and, most importantly, it appears that plaintiffs had a reasonable chance of successfully stating a claim if given another opportunity.

REVERSED and REMANDED.

REINHARDT, Circuit Judge, concurring separately:

The per curiam opinion concludes that none of the relevant factors compels dismissal without leave to amend. With this result I concur. I write separately, however, to express my concern regarding the use of cliches in judicial opinions, a technique that aids neither litigants nor judges, and fails to advance our understanding of the law. In particular, I regret the opinion's use of the undeservedly common "three bites at the apple" cliche, slip op. at 891, (even more commonly, "two bites at the apple") also employed by the district court, which in turn lifted it from the written submission of the prevailing party. Such cliches too often provide a substitute for reasoned analysis.

Not only did the district court here fail to identify any of the *Foman* factors that would have supported a dismissal with prejudice, but it also in effect adopted a "three strikes" rule for securities fraud pleading that has no support in precedent. In the district court's view, appellant had had "three bites" and deserved no more opportunities to comply with the stringent requirements of the PSLRA. Simply counting the number of times a plaintiff has filed a complaint cannot, however, substitute for an analysis of whether the rigorous standards of the PSLRA have been met.

The per curiam opinion regrettably (but deliberately) reiterates the same cliche used by the district court. Metaphors enrich writing only to the extent that they add something to more pedestrian descriptions. Cliches do the opposite; they deaden our senses to the nuances of language so often critical to our common law tradition. The interpretation and application of statutes, rules, and case law frequently depends on whether we can discriminate among subtle differences of meaning. The biting of apples does not help us.

It is one of the "great merits and advantages" of our common law tradition that, "instead of a series of detailed practical rules, established by positive provisions, and adapted to the precise circumstances of particular cases," we have "broad and comprehensive principles," which are then applied and interpreted by judges in the "precise circumstances of particular cases." *Norway Plains Co. v. Boston & Me. R.R.*, 67 Mass. 263, 267 (1854)(Shaw, C.J.). This process of adaptation and progress, embedded in our legal tradition, necessitates the careful exposition of prose in our opinion writing. A cliche like "three bites at the apple" provides a formalistic rule that does not account for the particularities of an individual case.

The problem of cliches as a substitute for rational analysis is particularly acute in the legal profession, where our style of writing is often deservedly the subject of ridicule. The problem is not ours alone, however. Cliches have an adverse effect on various modes of thinking, some of which are even more important to our future welfare than the legal analyses in which we engage. As George Orwell wrote, over a half century ago:

Modern English, especially written English, is full of bad habits which spread by imitation and which can be avoided if one is willing to take the necessary trouble. If one gets rid of these habits one can think more clearly, and to think clearly is a necessary step toward political regeneration: so that the fight against bad English is not frivolous and is not the exclusive concern of professional writers.[1]

It is long past time we learned the lesson Orwell sought to teach us.

---

1. George Orwell, "Politics and the English Language," 13 Horizon 76 (1946).