In re AIRGATE PCS,
INC. SECURITIES
LITIGATION

No.  CIV.A. 1:02–CV–1291–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 2005.

**1362**

David Lewis Balser, J. Timothy Mast, McKenna Long & Aldridge, Atlanta, GA, David W.T. Daniels, Erin E. Schneider, John C. Millian, Gibson Dunn & Crutcher, Washington, DC, Howard K. Coates, Jr., Milberg Weiss Bershad & Schulman, Boca Raton, FL, for AirGate PCS, Inc. Securities Litigation.

## OPINION AND ORDER

FORRESTER, District Judge.

This matter is before the court on the AirGate Defendants' motion to dismiss [53–1]; the Underwriter Defendants' motion to dismiss [56–1]; and the AirGate Defendants' motion to file supplemental authority [65–1].

## I.  Background

### A.  Procedural History

Plaintiff Wessley Ruggles, Ltd. ("Wessley Ruggles") filed suit against Defendants AirGate PCS, Inc.; Thomas M. Dougherty, President and Chief Executive Office of AirGate; Barbara L. Blackford, Vice President and General Counsel of AirGate; and Alan B. Catherall, Chief Financial Officer of AirGate (collectively, "the AirGate Defendants"), Credit Suisse First Boston (USA), Inc.; Lehman Brothers; UBS Warburg, LLC, n/k/a UBS Securities LLC; William Blair & Company, L.L.C.; Thomas Weisel Partners, LLC; and TD Securities (USA), Inc., f/k/a TD Securities (collectively, "the Underwriter Defendants") for issuing a materially false and misleading registration statement in connection with the December 14, 2001 secondary public offering of AirGate PCS, Inc., common stock. Specifically, Plaintiffs contend that all Defendants violated Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k and Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). They further assert that the individual Defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77o.

After numerous rounds of briefings, in an order dated August 17, 2004, the court appointed Wessley Ruggles, Ltd. and Jay Grant as Lead Plaintiffs and the law firms of Fruchter & Twersky and Chitwood Harley Harnes, LLP, as Co–Lead Counsel. Lead Plaintiffs filed an Amended Complaint (the "Complaint") on October 15, 2004. On December 30, 2004, both the AirGate and Underwriter Defendants filed the instant motions to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995).

### B. Facts

#### 1. *Background*

AirGate markets and provides digital personal communication services ("PCS"). Cmplt., ¶ 2. In July 1998, AirGate entered into a management contract with Sprint PCS ("Sprint") whereby AirGate received the right to exclusively market Sprint's services within AirGate's designated territory in the southeastern United States. *Id.*, ¶ 27. AirGate began commercial operations in January 2000 and as of September 2000, provided services to 56,689 customers. By September 2001, the number of customers reached 235,025. *Id.*, ¶ 30.

iPCS was also a network partner affiliate of Sprint covering territory in the midwestern United States. *Id.*, ¶ 56. iPCS launched its services in December 1999. On August 28, 2001, AirGate announced that it has signed a definitive agreement to merge with iPCS. *Id.*, ¶ 57. AirGate's offering of four million shares of its common stock was in connection with the iPCS merger. *Id.*, ¶ 62. During the course of 2002, wireless company stock prices began to drop, and AirGate recorded a "goodwill impairment" charge of $261.2 million for the quarter ended March 31, 2002. iPCS eventually went into bankruptcy in 2003.

AirGate filed a Registration Statement/Prospectus with the SEC on November 13, 2001. This universal shelf filing also incorporated AirGate's Annual Report on Form 10–K for the year ending September 30, 2000; AirGate's Quarterly Reports on Form 10–Q for the quarters ending December 31, 2000, March 31, 2001 and June 30, 2001; and AirGate's Current Reports on Form 8–K filed on August 29 and August 31, 2001. *Id.*, ¶ 64. On November 30, 2001, AirGate filed with the SEC its Pre-effective Amendment No. 1 to the Registration Statement/Prospectus. AirGate filed a Prospectus Supplement on December 14, 2002 and a Final Prospectus on January 10, 2002. *Id.*, ¶ 65.

#### 2. *"Fully Funded"*

AirGate's August 29, 2001 press release, filed with the SEC under Form 8–K on August 29, 2001, stated that after the merger with iPCS, "the combined company will [b]e fully funded and have a significant cash cushion." *Id.*, ¶ 72. AirGate's Registration Statement/Prospectus also stated:

> Our Fully Funded Business Plan. We believe our current business plan is fully funded. Based on our current plan, we expect to generate positive earnings before interest, taxes, depreciation and amortization, referred to as EBITDA, in the third calendar quarter of 2002.

*Id.*, ¶ 73.

#### 3. *"Churn Rate"*

The "churn" rate is the rate at which existing customer accounts are canceled. *Id.*, ¶ 2.[1] In May 2001, Sprint introduced a new marketing program called No Deposit/Account Spending Limit Program ("NDASL"). This program was aimed primarily at adding more "sub-prime" subscribers, that is, customers with poor credit ratings by offering them accounts without requiring a deposit. *Id.*, ¶ 37. Under this program, AirGate's subscriber numbers increased, but those customers had disproportionately poor credit. *Id.*, ¶ 40. AirGate then went back to Sprint and asked to be able to pull out of the NDASL program because it was too risky. *Id.*, ¶¶ 43–44. Sprint initially refused AirGate's request. *Id.*, ¶¶ 44–45. AirGate again approached Sprint in August 2001. Sprint stated that it expected churn rates

---

1. The "churn rate" is calculated by "the monthly rate of customer turnover expressed as the percentage of customers of the average customer base that both voluntarily and invol- untarily discontinued service during the month." December 31, 2001 Form 10–Q, at 18.

to increase from 3% to 6% because of the NDASL. *Id.,* ¶ 49. On November 15, 2001, Sprint allowed AirGate and its other affiliates to replace NDASL with the "Clear Pay" program. Clear Pay reinstituted deposit requirements, but only for the lowest credit quality customers. *Id.,* ¶ 50.

In AirGate's Form 10–K filed with the SEC on November 14, 2001, AirGate described the NDASL and Clear Pay programs:

> [U]nder the Sprint PCS service plans, customers who do not meet certain credit criteria can qualify for our digital wireless services under the Clear Pay Program. The Clear Pay Program replaced the No Deposit Account Spending Limit ("NDASL") program and is substantially similar but with an increased emphasis on payments of outstanding amounts. Under the Clear Pay Program, customers who do not meet certain credit criteria can select any plan offered, subject to an account spending limit.
>
> . . . .
>
> Prior to May 2001, all of these customers were required to make a deposit ranging from $125 to $200 that could be credited against future billings. In May 2001, the deposit requirement was eliminated on certain, but not all, credit classes ("NDASL"). As a result, a significant amount of our new customer additions have been under the NDASL program. The NDASL program has been replaced by the "Clear Pay Program."

*Id.,* ¶ 51 (citing AirGate Form 10–K, November 14, 2001).

AirGate's 10–Q for the quarter ended March 31, 2001, filed with the SEC on May 14, 2001, stated "[o]ur average monthly churn (net of 30 day returns) for the three months ended March 31, 2001, was 2.6%." *Id.,* ¶ 76. AirGate's November 13, 2001 press release filed with the SEC on November 14, 2001, under Form 8–K stated, "Churn, net of 30–day returns, was 2.8% in the fiscal fourth quarter, consistent with 2.8% in the prior quarter." *Id.,* ¶ 77. During a conference call on November 14, 2001, the transcript of which was filed with the SEC on Form 8–K on November 19, 2001, Defendant Catherall stated, "We are not seeing anything in our current metrics, October metrics that would indicate substantial escalation of the churn levels." *Id.,* ¶ 78.

### 4. *Future Revenue and Growth Prospects*

AirGate's August 29, 2001 press release stated that after the merger with iPCS, AirGate will be "the largest Sprint PCS network partner based on coverage," "would serve over 300,000 subscribers," span "attractive territory in seven states," and "[b]oast among the industry's highest subscriber growth rates." *Id.,* ¶ 81.

In a November 13, 2001 press release, AirGate stated that it had added more than 55,600 new subscribers and had increased net revenues $49.7 million over the last quarter. *Id.,* ¶ 82. Defendant Dougherty stated in the same press release that AirGate had "capp[ed] off an extraordinary year of unprecedented growth and progress . . . . By every measure, we delivered solid financial and operating results and consistently exceeded expectations. . . . [W]e continued to gain market share in our territory as evidenced by our exceptional subscriber growth." *Id.,* ¶ 83. The Registration Statement/Prospectus stated that the "increased net customers acquired during the year ended September 30, 2001 are attributable to having all of AirGate's 21 markets fully launched during fiscal 2001 and increasing demand for wireless services in the United States." *Id.,* ¶ 85.

### 5. Allowance for Doubtful Accounts, Average Monthly Service Revenues Per Customer, and GAAP

One of the measures of AirGate's performance is the Average Revenue Per User ("ARPU"). In the supplement to the Registration Statement/Prospectus, AirGate stated that ARPU is

[a]n important operating metric in the wireless industry.... ARPU summarizes the average monthly service revenue per customer. ARPU is computed by dividing service revenue by the average subscribers for the period (computed based upon monthly subscriber counts). AirGate previously reported ARPU net of an adjustment for the provision for doubtful accounts. As of September 30, 2001, AirGate began reporting ARPU gross of the provision for doubtful accounts, to be consistent with current industry practices.

*Id.*, ¶ 31.

During the fourth quarter of fiscal 2001, AirGate wrote off accounts receivable of more than 216% of their Allowance for Doubtful Accounts. The Allowance for Doubtful Accounts as a percentage of gross accounts receivable increased by 326% in the six months ending March 31, 2002. *Id.*, ¶ 33. By changing the manner in which the ARPU was calculated, AirGate reported an increase in ARPU in September 2001 from $59 to $62 rather than a decrease from $59 to $54. *Id.*, ¶ 34.

AirGate's November 13, 2001 press release stated, "AirGate PCS net loss of $111.0 million or $8.48 per share in the fiscal year ended September 30, 2001, compared with a net loss of $81.3 million or $6.60 per share for fiscal 2000." *Id.*, ¶ 87. Plaintiff alleges these statements "are untrue because AirGate failed to adequately recognize in their financial statements the risks related to credit losses from sub-prime customers." This understated AirGate's net losses because AirGate's Allow-ance for Doubtful Accounts was understated. *Id.*, ¶ 90.

The Supplement to the Registration Statement/Prospectus stated that AirGate "records an allowance for doubtful accounts to reflect the expected loss on the collection of receivables. Such allowance ... totaled $2.8 million at September 30, 2001 compared to $0.6 million at September 30, 2000." *Id.*, ¶ 91. Plaintiffs contend this statement is untrue because "AirGate failed to disclose that they did not adequately recognize credit losses from sub-prime customers in AirGate's financial statements, an action not in compliance with generally accepted accounting principles ("GAAP")." *Id.*, ¶ 92. Plaintiff also asserts that AirGate failed properly to set an allowance for uncollectible accounts in contravention of the Statement of Financial Accounting Standards 5 ("FASB 5"). *Id.*, ¶ 93. Because AirGate did not follow GAAP, Plaintiffs aver that AirGate's 2001 Form 10–K filed with the SEC on November 30, 2001 was false in its assertion that the company issued its financial statements in "conformity with accounting principles generally accepted in the United States." *Id.*, ¶ 96.

### 6. Network Buildout

AirGate's August 29, 2001 press release stated that "iPCS's build out, which is fully funded, is expected to be completed by the end of the year." *Id.*, ¶ 98. Defendant Dougherty made the same assertion in a conference call on November 14, 2001. *Id.*, ¶ 99. AirGate's Registration Statement/Prospectus also stated:

Our Nearly Complete Network Build–Out. We have completed the Network build-out of our southeast markets and nearly completed the network build-out of our mid-west markets. As a result, we will be able to focus our management's efforts and our cash resources on technology upgrades, increasing our

market penetration and improving operating efficiencies. *Id.*, ¶ 101.

However, Plaintiffs allege that a "former executive in the Finance Department at AirGate stated that AirGate knew it would take millions of dollars and perhaps years to upgrade iPCS's outdated and substandard network infrastructure." *Id.*, ¶ 59. As of September 30, 2001, iPCS's network was not completed and many towers were under construction. Former employees at AirGate and iPCS state that AirGate was aware of the widespread problems with the network and knew the network would not be completed by the end of the year. According to one employee, the buildout projection dates were "fudged" in order to get the merger done. Other employees stated that the iPCS network was too "immature" and that management at AirGate was aware of this problem. *Id.*, ¶ 60.

*Benefits of Merger*

In a November 13, 2001 press release when speaking about the merger, Defendant Dougherty stated, "[w]e are excited about the opportunity to leverage the expertise of both companies to more effectively penetrate our combined territories.... We are excited about the many opportunities before us and clearly believe this strategic combination will result in greater value for our shareholders." *Id.*, ¶ 103. He also stated in a November 14, 2001 conference call that this

> transaction represents a tremendous strategic opportunity for AirGate to significantly expand the size and scope of our operations and become the premiere Sprint affiliate. The additional operating efficiencies, financial flexibility, and growth potential were key factors in our decision to pursue this opportunity and we clearly believe this deal is in the best interest of AirGate and its shareholders.

*Id.*, ¶ 104. AirGate's Registration Statement/Prospectus also noted that iPCS believed it had sufficient funds to meets its needs through 2003. *Id.*, ¶ 106.

### C. Contentions

Plaintiffs contend that the statements contained in the Registration Statement/Prospectus material issued by AirGate were false or misleading when issued because they (1) misrepresented that AirGate's business plan was fully funded, (2) touted AirGate's growth in subscriber numbers without stating that the increased customers had sub-prime credit histories, (3) indicated the merger with iPCS would be beneficial, (4) stated that the network buildout of iPCS was nearly complete and would be finished by the end of 2001, (5) underestimated the impact of AirGate's increasing churn rate, (6) understated the Allowance for Doubtful Accounts that recognized credit losses from sub-prime customers, and (7) altered the calculation of monthly service revenues per customer.

In response, both the AirGate Defendants and the Underwriter Defendants argue that they are not "sellers" within the statutory definition under Section 12(a)(2) of the Securities Act and therefore cannot be liable.[2] Even if the court does determine that they are "sellers," both sets of Defendants also contend that many of the statements Plaintiffs assert are actionable were not contained in the amended Registration Statement/Prospectus filed on November 30, 2001 and therefore cannot form the basis of any liability. Both Defendants further aver that even if the court considers all of the statements raised by Plaintiffs in their complaint, those statements are "forward-looking" and are accompanied by cautionary statements. Therefore, they come within the "safe harbor" rules of the PSLRA or the common law doctrine of

---

**2.** The court GRANTS the AirGate Defendants' motion to file supplemental authority [65–1].

"bespeaks caution." Finally, Defendants argue that some of the statements pointed to by Plaintiffs are immaterial puffery.

## II. Discussion

### A. Background

Section 11 of the Securities Act provides a cause of action against the signers of a registration statement that "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2) similarly provides a cause of action against any person who "offers or sells a security" by means of a prospectus or oral communication "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). Section 15 makes control persons liable for violations of Sections 11 and 12 "with and to the same extent" as the person they control. 15 U.S.C. § 77*o*.

### B. Sellers

Plaintiffs describe that the offering was done pursuant to a "firm commitment ... contractual agreement under which [the Underwriter Defendants] agreed to purchase all of the shares for sale in the Offering for resale to the investing public." Cmplt., ¶ 19. The Section 12 Defendants' "actions of solicitation included participating in the preparation of the false and misleading Registration Statement/Prospectus." *Id.*, ¶ 115. Plaintiffs, therefore, allege that the AirGate Defendants and the Underwriter Defendants were "sellers and offerors" of the shares offered pursuant to the Registration Statement/Prospectus so as to bring them within the scope of Section 12(a)(2).

In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), in the context of Section 12(a)(1), the Supreme Court held that a "seller" includes (1) "the owner who passed title, or other interest in the security, to the buyer for value," and (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owners." *Id.* at 642, 647, 108 S.Ct. 2063.[3]

#### 1. *Underwriter Defendants*

█ There is no dispute that the offering at issue here was a "firm commitment" underwriting whereby the Underwriter Defendants purchased all shares for resale to the public. However, the Underwriting Defendants are correct in their assertion that Plaintiffs do not allege anywhere in their complaint that they actually purchased their securities from the Underwriter Defendants. Plaintiffs merely allege that they received the securities in the Offering which was conducted on a firm commitment basis. As the Underwriter Defendants argue, even in a firm commitment underwriting, it is possible that the underwriters sold to a broker who may have actually passed the title to Plaintiffs. Thus, the court finds that Plaintiffs have not sufficiently pled in their Complaint that they received their securities from the Underwriting Defendants and GRANTS the Underwriting Defendants' motion to dismiss on the basis that Plaintiffs have not alleged that they are "sellers" under Section 12(a)(2). As the court notes below, it is granting Plaintiffs leave to amend their complaint. The court assumes that Plaintiffs can remedy this omission by their amendment. In light of

---

**3.** The same scope of "seller" applies under Section 12(a)(2). *See Ryder International* *Corp. v. First American National Bank,* 943 F.2d 1521, 1527 (11th Cir.1991).

the fact that the court grants Plaintiffs leave to amend their complaint, the court proceeds to analyze Plaintiffs' claims with respect to the Underwriting Defendants.

### 2. *AirGate Defendants*

■ Because the AirGate Defendants did not pass title to the stocks to Plaintiffs, they can only be "sellers" under Section 12(a)(2) if Plaintiffs can show they "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owners." *See Pinter*, 486 U.S. at 647, 108 S.Ct. 2063. Plaintiffs contend in their complaint only that the AirGate defendants participated in the preparation of the Registration Statement/Prospectus. *See* Cmplt., ¶ 115.

In *Lone Star Ladies Investment Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001), the court discussed the parameters of the Supreme Court's holding in *Pinter* and applied it to an issuer in a firm commitment underwriting deal. The court recognized that although the issuer of the stock did not, itself, pass title, it is possible under certain circumstances for an issuer involved in a firmly underwritten public offering to be a "seller" under Section 12(a)(2) "where the issuer solicited the sale of the stock." *Id.* at 369–70 (citing *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996)). The court concluded, however, that:

> in a firm commitment underwriting, such as this one, the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers. Rather the public purchases from the underwriters, and suing the issuers is an attempt to "recover against [the] seller's seller." It is true that there are unusual cases in which the issuer is sufficiently active in promoting the securities as to essentially become the vendor's agent. But that possibility does not weaken this basic

principle. Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. That said, *Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent.

*Id.* at 370. The court in *Shaw* similarly explained that preparation of the registration statement, prospectus, or activities relating to the sale of the securities, standing alone, is insufficient to establish seller status. 82 F.3d at 1216; *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir.2003) (dismissing issuers under section 12 because plaintiff did not allege that the issuers had "actively solicited" plaintiffs to purchase the securities).

Here, Plaintiffs allege only that AirGate participated in the preparation of a false and misleading Registration Statement/Prospectus. *See* Cmplt., ¶ 115. This statement is devoid of any allegation that the AirGate Defendants participated in an "active solicitation" of sales. The court finds that this statement is insufficient—even under Rule 12(b)(6)—to allege that the AirGate Defendants are "sellers" under *Pinter*. Accordingly, the court dismisses Plaintiffs' Section 12(a)(2) causes of action against the AirGate Defendants. The court notes, however, that Plaintiffs' Section 11 claims against the AirGate Defendants survive, and thus, the court addresses both the AirGate Defendants and the Underwriter Defendants with respect to each of the misleading statements alleged by Plaintiffs.

### C. Contents of Registration Statement/Prospectus

Sections 11 and 12(a)(2) allow liability for false or misleading statements that are part of a "registration statement" or "prospectus." Here, AirGate filed an initial Registration Statement on November 13,

2001. This initial Registration Statement specifically incorporates by reference Air-Gate's Form 10–Q filings for the quarters ended March 31, 2001 and June 30, 2001 and AirGate's Form 8–K filings made on August 29, 2001, November 13, 2001, and November 19, 2001. A "Pre–Effective Amendment No. 1" to that initial Registration Statement was filed on November 30, 2001. As part of the Amendment, Form 10–Q and Form 8–K filings were no longer specifically incorporated by reference into the Registration Statement. The only documents incorporated into Amendment No. 1 are AirGate's Annual Report on Form 10–K for the year ended September 30, 2001 and its Current Reports on Form 8–K filed on November 30, 2001.[4] AirGate also filed its 2001 Form 10–K on November 30, 2001. Finally, AirGate filed a Prospectus Supplement with the SEC on December 14, 2001.

■■■■ The parties dispute whether Amendment No. 1 to the Registration Statement effectively supersedes the initial Registration Statement such that the attachments to the initial Registration State-ment cannot form the basis for liability for Plaintiffs' claims. The initial Registration Statement does state, "[t]he information in this Prospectus is not complete and may be changed." *Id.* at i. The Amended Registration Statement also informs investors to "rely only on the information contained in or incorporated by reference in this Prospectus . . . ." *Id.* at S–2. Significantly, the Amendment was filed on November 30, 2001, prior to the date on which Plaintiffs purchased their AirGate stock. Because Plaintiffs were informed prior to the time they acquired their shares that the Amended Registration Statement incorporated only AirGate's Annual Report on Form 10–K for the year ended September 30, 2001, and its Current Reports on Form 8–K filed on November 30, 2001, the court finds that Plaintiffs cannot rely on statements contained in AirGate's Form 10–Q filings for the quarters ended March 31, 2001 and June 30, 2001 and AirGate's Form 8–K filings made on August 29, 2001, November 13, 2001, and November 19, 2001, to support their securities claims.[5] In any event, for the purposes of

---

**4.** This document does not contain the August 29, 2001 press release referenced by Plaintiffs. It does contain a press release from November 29, 2001.

**5.** Plaintiffs point to 17 C.F.R. § 230.412 and contend that attachments to a registration statement are not deemed modified unless "a statement contained in the prospectus or in any other subsequently filed document which also is or is deemed to be incorporated by reference modifies or replaces such statement." *Id.*, § 230.412(a). However, additional subsections of § 230.412 state that the "modifying or superseding statement may, but need not, state that it has modified or superseded a prior statement or include any other information set forth in the document which is not so modified or superseded." *Id.*, § 230.412(b). Furthermore, the section provides that if a statement is "so modified[, it] shall not be deemed in its unmodified form to constitute part of the registration statement or prospectus for purpose of the Act." *Id.*,

§ 230.412(c). Thus, it would appear that even under Plaintiffs' argument, the additional attachments would not be deemed part of the Registration Statement. Finally, it is not even clear to the court that § 230.412 applies to this situation; rather, it relates to the modification of documents that were incorporated by reference into a registration statement, not the amendment of a registration statement itself.

Plaintiffs also cite 17 C.F.R. § 239.13 which describes the conditions a company must meet in order to qualify to utilize the shorter Form S–3 registration statement. Under § 239.13, a company must have filed all of its required SEC statements in a timely manner and have been filing those statements for at least a calendar year. *Id.* Because of this, Plaintiffs argue, AirGate's previously filed materials are "implicitly, if not explicitly" incorporated into its registration statements. The court does not agree that materials can be "implicitly" incorporated into a registration

ruling on Defendants' motions to dismiss, the court has considered the entirety of Plaintiffs' complaint so as to give the broadest breadth to Plaintiffs' claims.

### D. PSLRA's Statutory Safe Harbor and the "Bespeaks Caution" Doctrine

In enacting the PSLRA, Congress allowed defendants to avoid liability for "forward-looking statements" that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z–2(c)(1)(A)(i); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999) (discussing identical provision under the Exchange Act and noting that "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant"). A "forward-looking statement" is defined as

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included

statement on the basis of § 239.13. That section simply sets forth the conditions for using Form S–3 and has no relation to establishing liability under Sections 11 or 12(a)(2).

Finally, Plaintiffs point to an SEC statement in *In the Matter of Comico Corp.*, SEC File No. 2–13315, 1959 WL 59432 (April 27, 1959), concerning whether Comico could

pursuant to the rules and regulations of the Commission;

. . . .

15 U.S.C. § 77z–2(i). Under this statutory safe harbor, a defendant may not be liable even in the absence of accompanying cautionary language if the plaintiff fails to prove that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 77z–2(c)(1)(B)(i); *Harris*, 182 F.3d at 803.

Similarly, the common law "bespeaks caution" doctrine generally holds that meaningful cautionary statements and specific warnings accompanying an offering document may sufficiently render any alleged omissions or misstatements immaterial as a matter of law. *See Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d 399, 400 (11th Cir.1995) (adopting "bespeaks caution" doctrine as stated in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir.1993)). However, this court has previously noted that, "[s]tatements and omissions of past and current circumstances cannot be cured by reference to future difficulties and undetected problems." *See In re Premiere Technologies, Inc. Securities Litigation*, Civil Action No. 1:98–CV–1804–JOF, 2000 WL 33231639, at *17 (Dec. 8, 2000).

The Eleventh Circuit applied the PSLRA's safe harbor provisions in *Ehlert v. Singer*, 245 F.3d 1313 (11th Cir.2001). There, investors filed suit against the officers of a computer software company. The plaintiffs alleged that defendants made two misleading statements in the prospectus. First, "[t]he Company's fu-

withdraw a prior registration statement. *Comico*, however, relates to whether a corporation could withdraw a registration statement without first making modifications or amendments to cure what the SEC believed might be false or misleading statements. Here, AirGate filed an amendment to its initial registration statement.

ture success will depend, in part, upon its ability to enhance its current products, to respond effectively to technological changes, to sell additional products to its existing client base and to introduce new products and technologies that address the increasingly sophisticated needs of its clients." Second, "[t]he Company is devoting significant resources to the development of enhancements to its existing products and the migration of existing products to new software platforms." The plaintiffs contended these statements were misleading because they were not accompanied by any notification that the company did not intend to provide Year 2000 software upgrades to its main product, Version 8, and the company intended to introduce a new version, Version 9, of its main product.

The court first looked at the prospectus in its entirety to determine whether these statements were "forward looking." The court rejected the plaintiffs' contention that these were statements about "current" conditions because the company already knew it was discontinuing Version 8 of its system. Rather, viewing the prospectus section as a whole, the court found that it was a forward-looking statement because it related to future plans and future economic performance.

The court next considered whether the prospectus was accompanied by meaningful cautionary statements. The prospectus noted that "[t]he market for the Company's products is characterized by rapid change and technological advances requiring ongoing expenditures for research and development and the timely introduction of new products and the enhancement of existing products." Further, the company noted that "[t]here can be no assurance that the Company will successfully complete the development of new products or that the Company's current or future products will satisfy the needs of the market for practice management systems."

The company further stated that because the software handled confidential financial and medical records of patients, any failure to appropriately handle the Year 2000 transition could result in breach of contract or products liability claims against the company. The prospectus also noted that there was significant uncertainty in the industry relating to the Year 2000 transition issues that created risks for the company.

The court concluded that there were sufficient meaningful cautionary statements because the PSLRA safe harbor required only that the cautionary statements "mention 'important factors that could cause actual results to differ materially from those in the forward-looking statement.' It does not require that the prospectus list *all* factors that might influence the company's financial future." *Id.* at 1319–20 (emphasis in original); *see also Harris,* 182 F.3d at 807 ("[M]ust the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement? We think not . . . . [W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.").

### E. Contested Statements

#### 1. *"Fully Funded"*

■ Plaintiffs contend that the Registration Statement/Prospectus contained false or misleading statements concerning AirGate's funding. Specifically, Plaintiffs assert that AirGate's August 29, 2001 press release stated that after the merger with iPCS, "the combined company will [b]e fully funded and have a significant cash cushion." Cmplt., ¶ 72. AirGate's Registration Statement/Prospectus also stated:

Our Fully Funded Business Plan. We believe our current business plan is fully funded. Based on our current plan, we expect to generate positive earnings before interest, taxes, depreciation and amortization, referred to as EBITDA, in the third calendar quarter of 2002.

*Id.,* ¶ 73. Plaintiffs contend these statements are "untrue and/or misleading" because they "failed to disclose the material increase in the Company's allowance for doubtful accounts, high churn rate, increased expected losses under the ND–ASL and Clear Pay Programs, and poor overall customer credit quality." *Id.,* ¶ 75.

The court finds that AirGate's statements about its funding are forward-looking financial statements of the kind described in the PSLRA. *See* 15 U.S.C. § 77z–2(i). The statement in the press release clearly implicates events in the future. The Registration Statement reflects a "belief" that the current plan is fully funded and an "expect[ation]" that positive earnings would be generated in the future. Furthermore, the court notes that Plaintiffs do not allege that the current business plan was not fully funded; that is, they do not allege the statements are false, but rather only that they are misleading because they did not identify sufficiently increases in the Company's churn rate and doubtful allowances.[6] Plaintiffs have not put forward any allegations in their complaint that Defendants knew the "fully funded" statements were false at the time they were made.

The court must next consider whether the forward-looking statements were accompanied by meaningful cautionary statements. The Registration Statement/Prospectus contained the passage which includes a reference to an additional section that identifies risks of the investment:

These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance of achievements expressed or implied by these forward-looking statements. Specific factors that might cause such a difference include, but are not limited to:

- our ability to integrate iPCS's operations;
- our ability to finance future growth opportunities;
- our dependence on our affiliation with Sprint PCS;
- our ability to successfully complete the build-out of our Sprint PCS network in our midwest territory or to upgrade our Sprint PCS network to accommodate new technologies, including the upgrade to 1XRTT;
- our limited operating history and anticipation of future losses;
- our dependence on Sprint PCS' back office services;
- potential fluctuations in our operating results;
- changes or advances in technology;

---

**6.** Plaintiffs contend in their response to Defendants' motions to dismiss that they do allege the fully-funded statements were false when made. The court has reviewed the paragraphs of the complaint cited by Plaintiffs in their response and concludes that these paragraphs relate primarily to the build-out of iPCS's network, addressed below, and not to whether AirGate's business plan was fully funded. *See* Cmplt., ¶¶ 6 (network infra-

structure and write-off related to intangible assets from the acquisition), 59 (network infrastructure), 60 (incomplete network), 75 (alleging statements were "untrue and/or misleading" but arguing only a failure to disclose additional information), 107 (network infrastructure and need for upgrades), and 109 (general failure of Defendants to investigate statements in Registration Statement/Prospectus).

- changes in government regulation;
- competition in the industry and markets in which we operate;
- future acquisitions;
- our ability to attract and retain skilled personnel; and
- general economic and business conditions.

Prospectus Supplement, at S–21.

The risk factors in the Prospectus Supplement specifically addressed the "churn rate" and poor customer credit issues. The document states:

> Under the Sprint PCS service plans, customers who do not meet certain credit criteria can nevertheless select any plan offered, subject to an account spending limit, referred to as ASL, to control credit exposure.... Prior to May 2001, all of these customers were required to make a deposit ranging from $125 to $200 that could be credited against future billings. In May 2001, the deposit requirement was eliminated on certain, but not all, credit classes ("NDASL"). As a result, a significant amount of our new customer additions have been under the NDASL program. The NDASL program has [recently] been replaced by the "Clear Pay Program."
>
> . . . .
>
> We may experience a high rate of customer turnover which would adversely affect our financial performance. The wireless personal communications industry in general and Sprint PCS in particular have experienced a higher rate of customer turnover, commonly known as churn, as compared to cellular industry averages. Factors which may contribute to higher churn include: ... customer mix and credit class, including those related to the NDASL program and Clear Pay Program.
>
> A high rate of customer turnover could adversely affect our competitive posi-

tion, results of operations and our costs of, or losses incurred in, obtaining new subscribers, especially because we subsidize some of the costs of initial purchases of handsets by customers.

Prospectus Supplement, at S–17 and S–20.

Other risk factors identified in the Prospectus Supplement also include the "ability to market Sprint PCS services and manage customer turnover rates," "our ability to manage the growth of iPCS through the completion of its network build-out," substantial debt that iPCS and AirGate may not be able to service, "Sprint PCS may make business decisions that are not in our best interests, which may adversely affect our relationships with customers in our territories, increase our expenses and/or decrease our revenues," and intense competition in the wireless industry. *See id.* at S–12 to 19.

The court finds the language in the Registration Statement/Prospectus to be meaningful cautionary language within the scope of the PSLRA's safe harbor. Contrary to Plaintiffs' assertion that this language is "boilerplate," the court finds the warnings speak directly to risks unique to AirGate and the wireless industry. The extensive discussion of customer turnover and the pressure of the NDASL and Clear Pay programs on AirGate's churn rate is anything but boilerplate. Under these circumstances, the court finds that the "fully funded" statements come within the safe harbor of the PSLRA and dismisses Plaintiffs' claims with respect to these statements.

### 2. *"Churn Rate"*

■ Plaintiffs' allegations with respect to "churn rate" are similar. In addition to the description of the NDASL and Clear Pay programs described above, Plaintiffs point to AirGate's 10–Q for the quarter ending March 31, 2001, which stated, "[o]ur average monthly churn (net of 30

day returns) for the three months ended March 31, 2001, was 2.6%." Cmplt., ¶ 76. AirGate's November 13, 2001 press release stated, "[c]hurn, net of 30–day returns, was 2.8% in the fiscal fourth quarter, consistent with 2.8% in the prior quarter." *Id.*, ¶ 77. During a conference call on November 14, 2001, Defendant Catherall stated, "[w]e are not seeing anything in our current metrics, October metrics that would indicate substantial escalation of the churn levels." *Id.*, ¶ 78.

Plaintiffs contend these statements were "untrue and/or misleading" because AirGate "failed to disclose the credit risk for their sub-prime customers ... even though management was very concerned about the churn levels, future losses and bad debt that would accumulate as a result of targeting and acquiring sub-prime customers and not requiring a deposit from them under the ND–ASL and Clear Pay Programs." *Id.*, ¶ 80. In their response to Defendants' motions to dismiss, Plaintiffs further assert, "Defendants had a duty to disclose information about the increasing levels of churn caused by the addition of sub-prime customers, and the omitted information was necessary to make the statements about churn not misleading." Response, at 46–47. For example, in August 2001, at an affiliates' meeting, Sprint stated that it expected churn rates to increase from 3% to 6% because of the NDASL. *Id.* (citing Cmplt., ¶ 49).

As the court interprets this allegation, Plaintiffs do not—and cannot—contend that Defendants' historical statement of churn rates is inaccurate. Plaintiffs appear to aver that because Defendants did not disclose the credit risk associated with sub-prime customers acquired under the NDASL and Clear Pay programs, the historical churn rates are misleading. The court finds, however, that Plaintiffs' premise with respect to this allegation is incorrect. As the court noted above, AirGate

explained at length the potential problems that could arise from the sub-prime customers acquired under the NDASL and Clear Pay programs. *See* Supplemental Prospectus at S–17 and 20 ("We may experience a high rate of customer turnover which would adversely affect our financial performance.... Factors which may contribute to higher churn include: ... customer mix and credit class, including those related to the NDASL program and Clear Pay Program.... A high rate of customer turnover could adversely affect our competitive position, results of operations and our costs of, or losses incurred in, obtaining new subscribers, especially because we subsidize some of the costs of initial purchases of handsets by customers.").

The court finds that these cautionary statements clearly are meaningful and address specifically the problems Plaintiffs allege transpired. The court disagrees with Plaintiffs' assertion that the statements are insufficient because they were "buried" in the Prospectus Supplement and "do[ ] not explicitly state the concerns of management." *See* Response, at 49. The court finds that the statement in the Supplement that churn rates could be adversely affected by the types of customers added under the NDASL and Clear Pay programs is an explicit statement of concern by the management of AirGate. AirGate expressly warned that the churn rates could increase due to the sub-prime customers acquired under NDASL and Clear Pay. The rates did, indeed, rise. The fact that AirGate did not speculate in 2001 as to how high the churn rate might rise in 2002 does not render the Registration Statement/Prospectus misleading.

Because Defendants' statements concerning churn rate were accurate and because the Registration Statement/Prospectus warned that the rate could increase based upon the class of subscribers ac-

quired under the NDASL and Clear Pay programs, the court dismisses Plaintiffs' claims with respect to churn rate.

### 3. *Future Revenue and Growth Prospects*

■ AirGate's August 29, 2001 press release stated that after the merger with iPCS, AirGate will be "the largest Sprint PCS network partner based on coverage," "would serve over 300,000 subscribers," span "attractive territory in seven states," and "[b]oast among the industry's highest subscriber growth rates." Cmplt., ¶ 81. In a November 13, 2001 press release, AirGate stated that it had added more than 55,600 new subscribers and had increased net revenues $49.7 million over the last quarter. *Id.*, ¶ 82. Defendant Dougherty stated in the same press release that AirGate had "capp[ed] off an extraordinary year of unprecedented growth and progress. . . . By every measure, we delivered solid financial and operating results and consistently exceeded expectations. . . . [W]e continued to gain market share in our territory as evidenced by our exceptional subscriber growth." *Id.*, ¶ 83. The Registration Statement/Prospectus stated that the "increased net customers acquired during the year ended September 30, 2001 are attributable to having all of AirGate's 21 markets fully launched during fiscal 2001 and increasing demand for wireless services in the United States." *Id.*, ¶ 85.

Plaintiffs contend that these statements are untrue

> because they gave the false impression that AirGate had strong future revenue and profit growth prospects based on the rapid increases in the number of customers and the size of its market share. In reality, the customer additions and subscriber growth the Company had experienced in 2001 was, at least in part, attributable to the then-undisclosed elimination of the deposit requirements for sub-prime customers under

the ND–ASL and Clear Pay programs. Moreover, the real churn rate experienced by the Company was not disclosed.

*Id.*, ¶ 86.

As an initial matter, the court agrees with Defendants that nothing in these statements makes any comment as to AirGate's future revenue; rather, the statements deal mainly with subscriber growth. Next, the allegation in Paragraph 86 that the "real churn rate" of the Company was not disclosed is belied by other paragraphs in Plaintiffs' complaint, which note the accurate disclosure of historic churn rates.

Finally, as with Plaintiffs' previous claims, Plaintiffs do not assert that any of the factual information related in these statements is false. Rather, Plaintiffs contend it is misleading because the subscriber growth experienced by AirGate was attributable to the NDASL and Clear Pay programs. Specifically, Plaintiffs contend that the subscriber growth rate information was "not true" because Defendants "failed to disclose the fact that subscriber growth was being driven primarily by the ND–ASL and Clear Pay Programs, and that the sub-prime customers who were fueling subscriber growth were of poor credit quality." Response, at 50.

However, the Prospectus Supplement clearly states that a "significant amount of our new customer additions" have been under the NDASL and Clear Pay programs. *See* Supplement, at S–17 ("In May 2001, the deposit requirement was eliminated on certain, but not all, credit classes ('NDASL'). As a result, a significant amount of our new customer additions have been under the NDASL program. The NDASL program has . . . been replaced by the 'Clear Pay Program.' "). The question then becomes whether AirGate's statements of "exceptional subscriber growth" are misleading in the context of

the entire Registration Statement/Prospectus. *See Ehlert,* 245 F.3d at 1317. The court finds that it is not.

As cited by Plaintiffs in Paragraph 85 of their Complaint, after a recitation of the numerical increase in subscribers, the Registration Statement says the following: "AirGate does not include in its financial statements an estimate of revenues or subscribers related to those customers for which collection of revenues is not reasonably assured. The increased net customers acquired during the year ended September 30, 2001 are attributable to having all of AirGate's 21 markets fully launched during fiscal 2001 and increasing demand for wireless services in the United States." AirGate informs potential investors of its subscriber growth—an empirical fact—but then cautions the investor that a substantial part of the growth has been derived from special programs that do not require a deposit from customers resulting in the possibility that such customers might be result in a "poor credit mix" leading to higher churn. *See* Supplemental Prospectus at S–17 and 20.[7] Because of this specific risk statement, the court disagrees with Plaintiffs' contention that "no disclosure is made connecting the extraordinary subscriber growth, the elimination of the deposit requirement and the risk of adding sub-prime customers." Response, at 53. As with Plaintiffs' previous assertions, the Registration Statement/Prospectus states precisely what Plaintiffs would have it state, and the court grants Defendants' motions to dismiss on the subscriber growth claim.

### 4. Allowance for Doubtful Accounts, Average Monthly Service Revenues Per Customer, and GAAP

Plaintiffs aver that AirGate underestimated its Allowance for Doubtful Accounts in miscalculations that violated Generally Accepted Accounting Principles.[8] During the fourth quarter of fiscal 2001, AirGate wrote off accounts receivable of over 216% of their Allowance for Doubtful Accounts. The Allowance for Doubtful Accounts as a percentage of gross accounts receivable increased by 326% in the six months ending March 31, 2002. *Id.,* ¶ 33.

Plaintiffs further allege this underestimation rendered misleading AirGate's financial statements because "AirGate failed to disclose that they did not adequately recognize credit losses from sub-prime customers in AirGate's financial statements, an action not in compliance with generally accepted accounting principles ("GAAP")." *Id.,* ¶ 92. Plaintiffs also assert that AirGate failed properly to set an allowance for uncollectible accounts in contravention of the Statement of Financial Accounting Standards 5 ("FASB 5"). *Id.,* ¶ 93. Because AirGate did not follow GAAP, Plaintiffs aver that AirGate's 2001 Form 10–K filed with the SEC on November 30, 2001 was false in its assertion that the company issued its financial statements in "conformity with accounting principles generally accepted in the United States." *Id.,* ¶ 96.

AirGate's November 13, 2001 press release, under Form 8–K stated, "AirGate PCS net loss of $111.0 million or $8.48 per share in the fiscal year ended September

---

7. *The Registration Statement recognizes that* outside the context of the NDASL and Clear Pay programs, subscriber growth can be attributed to the fact that AirGate became operational to the full extent of its territorial limits, as well as increasing demand in the industry.

8. *The Supplement to the Registration State-* ment/Prospectus stated that AirGate "records an allowance for doubtful accounts to reflect the expected loss on the collection of receivables. Such allowance ... totaled $2.8 million at September 30, 2001 compared to $0.6 million at September 30, 2000." *Id.,* ¶ 91.

30, 2001, compared with a net loss of $81.3 million or $6.60 per share for fiscal 2000." *Id.,* ¶ 87. Plaintiffs also allege these statements "are untrue because AirGate failed to adequately recognize in their financial statements the risks related to credit losses from sub-prime customers." This understated AirGate's net losses because AirGate's Allowance for Doubtful Accounts was understated. *Id.,* ¶ 90.

Plaintiffs contend that the misleading nature of the underestimation of the Allowance for Doubtful Accounts was compounded by AirGate changing the manner in which the ARPU was calculated.[9] If AirGate had not changed the method of calculating ARPU, instead of reporting an increase in ARPU in September 2001 from $59 to $62, it would have reported a decrease from $59 to $54, Plaintiffs contend. *Id.,* ¶ 34.

The premise for all of Plaintiffs' allegations in this section of their complaint is that the Allowance for Doubtful Account was understated in the September 2001 financial information provided in the Registration Statement/Prospectus. However, the only basis Plaintiffs raise for their contention that the Allowance for Doubtful Account was understated is the fact that in fiscal 2002, AirGate's auditors asked to look at the underlying accounts receivable data from Sprint to determine the Allowance for Doubtful Accounts. Cmplt., ¶ 36. After this information was obtained, AirGate wrote off more than $34 million or 256% of the Allowance for Doubtful Accounts held by AirGate at the beginning of the fourth quarter of 2002. *Id.* The mere fact that the auditors requested more information in fiscal year 2002 and that a writeoff occurred in the last quarter, standing alone, provides no evidence that there was any accounting problem in 2001.

Furthermore, Plaintiffs do not allege any manner in which AirGate's 2001 reporting of the Allowance for Doubtful Accounts violates Generally Accepted Accounting Principles. Plaintiffs point to Statement of Financial Accounting Standards 5, which requires that an estimated loss from a loss contingency should be charged to income if it is probable that such a loss has been incurred at the time the financial statement has been made and the loss can be reasonably estimated. There is no allegation in the complaint that more than the $2.8 million stated by the Allowance for Doubtful Accounts in 2001 would not be recovered. The court finds that the mere assertion that the 2001 calculations violated a financial accounting rule without explanation is akin to pleading a legal conclusion. *See Oxford Asset Management, Ltd. v. Jaharis,* 297 F.3d 1182, 1194 (11th Cir.2002) (affirming dismissal of plaintiff's complaint where complaint did "nothing more than offer the legal conclusion that the representation in the prospectus was somehow misleading").

Moreover, despite Plaintiffs' implication to the contrary, the change in the calculation of the ARPU was fully disclosed in the Prospectus Supplement which stated: "*Average Revenue Per User (ARPU)* .... AirGate previously reported ARPU net of an adjustment for the provision for doubtful accounts. As of September 30, 2001, AirGate began reporting ARPU

---

9. In the supplement to the Registration Statement/Prospectus, AirGate stated that ARPU is
   [a]n important operating metric in the wireless industry.... ARPU [Average Revenue Per User] summarizes the average monthly service revenue per customer. ARPU is computed by dividing service revenue by the average subscribers for the period

(computed based upon monthly subscriber counts). AirGate previously reported ARPU net of an adjustment for the provision for doubtful accounts. As of September 30, 2001, AirGate began reporting ARPU gross of the provision for doubtful accounts, to be consistent with current industry practices. Cmplt., ¶ 31.

gross of the provision for doubtful accounts, to be consistent with current industry practice." *Id.* at S–35. Plaintiffs claim that Defendants "failed to disclose the material *impact*," *see* Response, at 9 (emphasis added), of this change is not actionable. Defendants fully disclosed this change in calculation and the Registration Statement/Prospectus warned of the potential problems in credit mix with the sub-prime customers.

### 5. *Benefits of Merger*

■ In a November 13, 2001 press release concerning the merger, Defendant Dougherty stated, "[w]e are excited about the opportunity to leverage the expertise of both companies to more effectively penetrate our combined territories.... We are excited about the many opportunities before us and clearly believe this strategic combination will result in greater value for our shareholders." Cmplt., ¶ 103. He also stated in a November 14, 2001 conference call that this "transaction represents a tremendous strategic opportunity for AirGate to significantly expand the size and scope of our operations and become the premiere Sprint affiliate. The additional operating efficiencies, financial flexibility, and growth potential were key factors in our decision to pursue this opportunity and we clearly believe this deal is in the best interest of AirGate and its shareholders." *Id.*, ¶ 104. AirGate's Registration Statement/Prospectus also noted that iPCS believed it had sufficient funds to meet its needs through 2003. *Id.*, ¶¶ 105–06.

Plaintiffs contend these statements were "untrue because they gave the materially false impression that the merger with iPCS would provide significant value to AirGate's shareholders," but the Registration Statement/Prospectus failed to disclose the inadequacies in iPCS's network and the millions of dollars in upgrades that would be needed. *Id.*, ¶ 107.

In *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir.1997), the plaintiffs alleged that an officer's statements that there was "substantial success" in integrating the sales force of two companies, the merger was moving "faster than we thought," the merger presented a "compelling set of opportunities for the company," by moving to an integrated sales force, the companies were "leveraging our combined knowledge," and an expectation that "network applications will quickly reshape customer expectations" were false and misleading. The court held that these statements are the "sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism." *Id.* at 1121–22; *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996) (statement that company was " 'optimistic' about [its earnings] in 1993" and that it "should deliver income growth consistent with its historically superior performance" held to be mere "puffery" and to "lack the sort of definitive positive projections that might require later correction") (internal quotations omitted); *Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir.1995) (holding that statements that a company was "recession-resistant" and that it would maintain a "high" level of growth were too vague to constitute material statements of fact); *Hillson Partners Ltd. v. Adage, Inc.*, 42 F.3d 204, 212–14 (4th Cir.1994) (statements in press release that year would "produce excellent results" and that "significant sales gains should be seen as the year progresses" held to be mere general predictions and not material as a matter of law); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (statements in Annual Report that company expected "10% to 30% growth rate over the next several years" and was "poised to carry the growth and success of 1991 well

into the future" held to be immaterial "soft 'puffing'" statements).

Standing alone, the court finds that AirGate's statements about the benefits of the merger with iPCS are classic examples of mere "puffery." Phrases like "the opportunity to leverage," "more effectively penetrate our combined territories," "strategic combination," "additional operating efficiencies, financial flexibility, and growth potential" are simply too general to be material. All of the cases cited by Plaintiffs deal with much more specific statements concerning the benefits of a merger. *Cf. Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000) (inventory situation in "good shape" or "under control" when defendants allegedly knew the contrary to be true); *Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir.1996) (assertions that company was doing fine could be misleading where company produced drug that plaintiffs alleged defendants knew would not be approved in a timely fashion by the FDA); *In re Premiere Technologies Securities Litigation,* 2000 WL 33231639 (N.D.Ga. Dec.8, 2000) (Forrester, J.) ("fully integrated worldwide network infrastructure"). For these reasons, the court grants Defendants' motions to dismiss with respect to the benefits of the merger statements. The court addresses below the problems with the network buildout because the court does not find the general comments about the benefits of the merger to be sufficiently linked to the network buildout to warrant conjunctive discussion as none of the comments about the merger speak to the network.

### 6. *Network Buildout*

■ AirGate's August 29, 2001 press release stated, "iPCS's build out, which is fully funded, is expected to be completed by the end of the year." Cmplt., ¶ 98. Defendant Dougherty made the same assertion in a conference call on November 14, 2001. *Id.,* ¶ 99. AirGate's Registration Statement/Prospectus also stated:

> *Our Nearly Complete Network Build-Out.* We have completed the Network build-out of our southeast markets and nearly completed the network build-out of our mid-west markets. As a result, we will be able to focus our management's efforts and our cash resources on technology upgrades, increasing our market penetration and improving operating efficiencies.

*Id.,* ¶ 101.

However, Plaintiffs allege that a "former executive in the Finance Department at AirGate stated that AirGate knew it would take millions of dollars and perhaps years to upgrade iPCS's outdated and substandard network infrastructure." *Id.,* ¶ 59. As of September 30, 2001, iPCS's network was not completed and many towers were under construction. Former employees at AirGate and iPCS state that AirGate was aware of the widespread problems with the network and knew the network would not be completed by the end of the year. According to one employee, the buildout projection dates were "fudged" in order to get the merger done. Other employees stated that the iPCS network was too "immature" and that management at AirGate was aware of this problem. *Id.,* ¶ 60. Plaintiffs aver that AirGate's statements were misleading and "untrue when made because, according to numerous confidential sources cited, iPCS's physical infrastructure and network was outdated, inadequate and would take years to upgrade and complete." *Id.,* ¶ 102.

The court finds that the statements about the network buildout could come within the PSLRA's safe harbor for forward-looking statements because they contain both current fact and future prediction. *See Ehlert,* 245 F.3d at 1317 (court considered registration statement in its en-

tirety to determine whether statements were forward looking); *Harris,* 182 F.3d at 806 (recognizing that "forward looking conclusions often rest on both historic observations and assumptions about future events"). However, unlike the other statements raised by Plaintiffs, AirGate's comments about the network infrastructure, according to the allegations in Plaintiffs' Complaint, were untrue at the time they were made. AirGate states in the Registration Statement that the network buildout for the Midwest was "nearly completed." According to Plaintiffs' complaint, numerous employees of AirGate knew at that time that the network buildout was nowhere near completed. *See* Cmplt., ¶ 60 (as of September 2001, many towers of iPCS still under construction, network inoperable, network infrastructure not in place and in "terrible shape," many buildout sites put on hold, network "substandard" and "too immature," build out process "horrendous").

Defendants' argument that the problems raised in the Complaint relate to "upgrades," which the Registration Statement/Prospectus indicated would take place in the future, is unavailing. *See* Prospectus Supplement, at S–12 ("iPCS will require significant funds for the continued development, construction, testing, deployment and operating of its network. These activities are expected to place demands on our managerial, operational and financial resources."); at S–21 (Company's results may be affected by "our ability to

successfully complete the build-out of our Sprint PCS network in our Midwest territory or to upgrade our Sprint PCS network to accommodate new technologies, including the upgrade to 1XRTT"). The allegations raised by Plaintiffs clearly relate to the infrastructure itself and not any technological upgrades. Plaintiffs' Complaint references on several occasions allegations that iPCS was unable to provide service to many of its current customers due to network problems. Similarly, the cautionary statements referenced by Defendants are not meaningful because—according to Plaintiffs' complaint—Defendants knew at the time the statements were made that there were substantial problems with the network buildout. For these reasons, the court finds that Plaintiffs' allegations with respect to the status of the network buildout with iPCS survive Defendants' motions to dismiss.[10]

## F. Summary

The court concludes that Plaintiffs did not sufficiently plead that the Underwriter Defendants actually passed title in the securities to them, and therefore the court finds that Plaintiffs have not pled that the Underwriter Defendants are "sellers" under Section 12(a)(2) and grants their motion to dismiss on that basis. Furthermore, with respect to the Section 12(a)(2) claim only, the court also finds that Plaintiffs have not made sufficient allegations to demonstrate the AirGate Defendants are "sellers" and grants their motion to dismiss on the basis of that section.

---

**10.** The court recognizes that the Underwriter Defendants argue that while AirGate might have known the difficult status of network operations, the Underwriter Defendants did not. Plaintiffs' complaint avers that Defendants did not make a "reasonable investigation" and did not have "reasonable grounds for the belief that the statements contained in the Registration Statement/Prospectus were true ...." Cmplt., ¶ 109. Further, Plaintiffs allege that Defendants "knew of, or in the

exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials ...." *Id.,* ¶ 116. While the court declines to dismiss the Underwriter Defendants at this stage in the litigation, the court notes they do raise a colorable defense that there is no allegation that they had "actual" knowledge that the statements concerning the network buildout were false, and the court will no doubt be asked to revisit that issue in the future.

In analyzing their actual claims, Plaintiffs raise two general categories of allegedly misleading statements. First, Plaintiffs contend that Defendants were overly optimistic about the future financial success of AirGate because AirGate ignored the potential problems of the increasing numbers of sub-prime customer accounts. As the court has described above, however, the Registration Statement/Prospectus specifically described the NDASL and Clear Pay programs and set forth the problems that could arise from a bad mix of credit risk customers. Second, Plaintiffs allege that Defendants were overly optimistic about the benefits of the merger with iPCS because there were substantial network and upgrading hurdles to overcome. The court finds that Plaintiffs pled sufficient facts to allege that AirGate knew of these network difficulties at the time it was making positive statements about the merger, and the statements about the network could be materially misleading. As such, Plaintiffs may proceed with their claim as to the statements concerning the network buildout.

## III. Conclusion

The court GRANTS IN PART AND DENIES IN PART the AirGate Defendants' motion to dismiss [53–1]; GRANTS the Underwriter Defendants' motion to dismiss [56–1]; and GRANTS the AirGate Defendants' motion to file supplemental authority [65–1].

The court grants Plaintiffs leave to amend their complaint within twenty (20) days from the date of this order. If Plaintiffs choose not to amend their complaint, Defendants are DIRECTED to answer Plaintiffs' complaint within thirty (30) days from the date of this order.

**IT IS SO ORDERED.**